**2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151**

# United States Court of Appeals for the Federal Circuit

INTEX RECREATION CORP.,

*Appellant,*

BESTWAY (USA), INC.,

*Appellee,*

– v. –

TEAM WORLDWIDE CORPORATION,

*Cross-Appellant,*

– v. –

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Intervenor.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2018-00870, IPR2018-00871, IPR2018-00872, IPR2018-00873, IPR2018-00874 Beverly M. Bunting, Eric C. Jeschke, James J. Mayberry, Administrative Patent Judges*

## NON-CONFIDENTIAL CROSS-APPELLANT'S BRIEF AND RESPONSIVE BRIEF

ROBERT M. HARKINS, JR.
RUYAKCHERIAN LLP
1936 University Avenue, Suite 350
Berkeley, California 94704
(510) 944-0185
bobh@ruyakcherian.com

TIMOTHY E. BIANCHI
SCHWEGMAN LUNDBERG & WOESSNER, PA
1600 TCF Tower
121 South Eighth Street – TCF Tower
Minneapolis, Minnesota 55402
(612) 373-6900
*tbianchi@slwip.com*

*Counsel for Cross-Appellant and Appellee Team Worldwide Corporation*

ORIGINALLY FILED: JUNE 8, 2022
CORRECTED: JUNE 9, 2022

# CLAIMS AT ISSUE – U.S. PATENT NO. 7,246,394

1. An inflatable product, including:

an inflatable body;

a housing built into the inflatable body, the housing having an interior region; and

an air conduit disposed at least in part in the housing, the air conduit being movable between a first position and a second position while remaining disposed at least in part in the housing, the fan and motor inflating the inflatable body when the air conduit is in the first position, and deflating the inflatable body when the air conduit is in the second position;

wherein air flows between the interior region of the housing and the inflatable body during inflation and deflation.

2. The inflatable product as claimed in claim 1, wherein air flows from the interior region of the housing into the inflatable body when the air conduit is in the first position.

3. The inflatable product as claimed in claim 1, wherein air flows from the inflatable body into the interior region of the housing when the air conduit is moved to the second position.

4. The inflatable product as claimed in claim 1, wherein the air conduit is a pipe.

5. The inflatable product as claimed in claim 4, wherein the pipe is rotatable.

6. The inflatable product as claimed in claim 4, wherein the pipe is a switching pipe.

7. The inflatable product as claimed in claim 1, wherein the air conduit is arranged to convey air pumped by the fan and motor assembly.

8. The inflatable product as claimed in claim 7, wherein the air conduit has a first end and a second end, and wherein the fan and motor assembly causes air to be conveyed from the first end of the air conduit to the second end of the air conduit when the air conduit is in the first position.

9. The inflatable product as claimed in claim 8, wherein the fan and motor assembly causes air to be conveyed in sequence from ambient, through the first end of the air conduit, to the second end of the air conduit, and into the inflatable body when the air conduit is in the first position.

10. The inflatable product as claimed in claim 8, wherein the fan and motor assembly causes air to be conveyed from the second end of the air conduit to the first end of the air conduit when the air conduit is in the second position.

11. The inflatable product as claimed in claim 10, wherein the fan and motor assembly causes air to be conveyed in sequence from the inflatable body, through the second end of the air conduit, to the first end of the air conduit, to ambient when the air conduit is in the second position.

12. The inflatable product as claimed in claim 1, wherein the fan and motor are received in the housing.

16. An inflatable product including:

an inflatable body;

a fan and motor assembly for pumping air;

a housing built into the inflatable body, the housing having an interior region; and

an air conduit having a first end and a second end, the air conduit disposed at least in part in the housing and arranged to convey air pumped by the fan and motor assembly, the air conduit being movable between a first position and a second position, the fan and motor inflating the inflatable body when the air conduit is in the first position, and deflating the inflatable body when the air conduit is in the second position;

wherein air flows between the interior region of the housing and the inflatable body during inflation and deflation, and

wherein the fan and motor assembly causes air to be conveyed from the first end of the air conduit to the second end of the air conduit when the air conduit is in the first position, and the fan and motor assembly causes air to be conveyed in sequence from the inflatable body, through the second end of the air conduit, to the first end of the air conduit, to ambient when the air conduit is in the second position.

17. The inflatable product as claimed in claim 16, wherein air flows from the interior region of the housing into the inflatable body when the air conduit is in the first position.

18. The inflatable product as claimed in claim 16, wherein air flows from the inflatable body into the interior region of the housing when the air conduit is moved to the second position.

19. The inflatable product as claimed in claim 16, wherein the air conduit is a pipe.

20. The inflatable product as claimed in claim 19, wherein the pipe is rotatable.

21. The inflatable product as claimed in claim 19, wherein the pipe is a switching pipe.
22. The inflatable product as claimed in claim 16, wherein the fan and motor assembly causes air to be conveyed in sequence from ambient, through the first end of the air conduit, to the second end of the air conduit, and into the inflatable body when the air conduit is in the first position.
23. The inflatable product as claimed in claim 16, wherein the fan and motor are received in the housing.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151

**Short Case Caption** Intex Recreation Corp. v. Team Worldwide Corporation

**Filing Party/Entity** Team Worldwide Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/09/2022

Signature: /s/ Robert M. Harkins, Jr.

Name: Robert M. Harkins, Jr.

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Team Worldwide Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Team Worldwide Corporation v. Macy's, Inc. & Macys.com, LLC, No. 2:19-cv-00099-JRG (E.D. Tex.) | Team Worldwide Corporation v. Dick's Sporting Goods, Inc., No. 2:19-cv-00097-JRG (E.D. Tex.) | Team Worldwide Corporation v. Amazon.com, Inc. and Amazon.com LLC, No. 2:19-cv-00094-JRG (E.D. Tex.) |
| Team Worldwide Corporation v. Target Corporation and Target Brands, Inc., No. 2:19-cv-00100-JRG (E.D. Tex.) | Team Worldwide Corporation v. Costco Wholesale Corporation, No. 2:19-cv-00096-JRG (E.D. Tex.) | Team Worldwide Corporation v. Ace Hardware Corporation, No. 2:19-cv-00093-JRG (E.D. Tex.) |
| Team Worldwide Corporation v. The Home Depot, Inc., No. 2:19-cv-00098-JRG (E.D. Tex.) | Team Worldwide Corporation v. Bed Bath & Beyond, Inc., No. 2:19-cv-00095-JRG (E.D. Tex.) | Team Worldwide Corporation v. Academy, Ltd. d/b/a Academy Sports + Outdoors, No. 2:19-cv-00092-JRG (E.D. Tex.) |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**Section 5 (Continued) Additional Related Cases**

Team Worldwide Corporation v. Sears, Roebuck and Co., Sears Holdings Corporation, and Transform Holdco LLC, No. 2:20-cv00006 (E.D. Tex.)

# TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT ....... 1
II. STATEMENT OF ISSUES ....... 1
III. STATEMENT OF THE CASE ....... 3
A. Introduction ....... 3
1. Case Nos. 20-1141, 20-1142, and 20-1143 – Responsive Brief ....... 4
2. Case Nos. 20-1149, 20-1150, and 20-1151 – Cross-Appeals ....... 4
B. Background ....... 6
C. Summary of the ’394 Patent ....... 8
IV. STATEMENT OF FACTS ....... 12
A. ’394 Patent – Claim Construction ....... 12
B. ’972 Patent – Chaffee (U.S. Patent No. 7,039,972) ....... 12
C. ’067 Patent – Goldsmith (U.S. Patent No. 2,493,067) ....... 14
D. ’046 Patent – Wu (U.S. Patent No. 6,698,046) ....... 16
E. ’344 Patent – Walker (U.S. Patent No. 4,890,344) ....... 17
F. ’377 Patent – Miller (U.S. Patent No. 5,529,377) ....... 18
G. ’960 Patent – Parienti (U.S. Patent No. 6,018,960) ....... 20
H. ’528 Patent – Scott (U.S. Patent No. 4,938,528) ....... 23
I. ’825 Patent – Pisante (French Patent No. 2583825) ....... 24
V. SUMMARY OF THE ARGUMENT ....... 26
VI. ARGUMENT – RESPONSIVE BRIEF ....... 33
A. The Board Did Not Err Regarding Miller (IPR2018-00872) ....... 33
1. For the Miller and Scott Combination, the “Air Conduit” is Not “Disposed at Least in Part in the Housing” as Required by the ’394 Patent as Petitioners Admit Miller’s Valve is Located Outside the Housing ....... 34
2. The Miller Reference Itself Argues Against Substitution ....... 36
3. Board Correctly Finds that Petitioners’ Proposed Modifications to Miller are Unsupported ....... 37
4. Appellant Puts Forth Unsupported New Argument in its Opening Brief 40

B. The Board Did Not Err Regarding Parienti (IPR2018-00873) ...... 42
1. The Board Correctly Identified Petitioners' New Reply Argument for the "Built Into" Limitation in Parienti as Improper ...... 43
2. The Board Correctly Found the Improper Argument in the Reply Brief Still Failed to Show that Parienti Satisfies the "Built Into" Limitation ...... 44
3. The Board Did Not Diverge from the Agreed Construction for "Built Into" in the IPR2018-00873 Final Written Decision for the Improper Reply Argument ...... 45
4. The Board Correctly Found Petitioners Failed to Show Pipe 9 is Part of Parienti's Housing ...... 47
VII. ARGUMENT – CROSS APPEALS ...... 49
A. Standard of Review ...... 49
B. The Board Erred Regarding Chaffee, Wu, and Goldsmith ...... 50
1. Chaffee ...... 50
2. Wu and Goldsmith fail to disclose an "Inflatable Body" ...... 63
C. Secondary Considerations of Evidence of Commercial Success Support Nonobviousness ...... 69
D. The Board Erred Regarding Obviousness Combinations ...... 75
1. Wu and Chaffee ...... 76
2. Wu and Goldsmith ...... 77
3. Walker and Chaffee ...... 78
4. Walker and Goldsmith ...... 80
5. Chaffee and Wu ...... 81
6. Chaffee and Scott and Pisante ...... 84
VIII. Conclusion ...... 85

CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order. The confidential information on pages 7, 11, 72, 73, 74, and 75, relates to financial data of third parties, which has been designated as confidential

# TABLE OF AUTHORITIES

**Cases**

*Aqua Prods. V. Matal*, 872 F.3d 1290 (Fed. Cir, 2017) ........................................64
*Arthrex, Inc. v. Smith & Nephew, Inc*., 935 F.3d 1319 (Fed. Cir. 2019).......... 46, 47
*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc*., 776 F.2d 281 (Fed. Cir. 1985) ........................................................................................................71
*ClassCo, Inc. v. Apple, Inc*., 838 F.3d 1214 (Fed. Cir. 2016) ................................50
*Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016) ....................................63
*D'Agostino v. MasterCard Int'l, Inc*., 844 F.3d 945 (Fed. Cir. 2016) .....................64
*In re Bigio*, 381 F.3d 1320 (Fed. Cir. 2004) .................................................. 78, 81
*In re GPAC Inc*., 57 F.3d 1573 (Fed. Cir. 1995) ...................................................70
*In re Huang*, 100 F.3d 135 (Fed. Cir. 1996)..........................................................70
*In re Kao*, 639 F.3d 1057 (Fed. Cir. 2011) ............................................................70
*Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292 (Fed. Cir. 2015) .....................64
*Muniauction, Inc. v. Thomson Corp*., 532 F.3d 1318 (Fed. Cir. 2008)...................70
*Personalized Media Communs., LLC v. Apple Inc*., 952 F.3d 1336 (Fed. Cir. 2020) ...........................................................................................................49
*PGS Geophysical AS v. Iancu*, 891 F.3d 1354 (Fed. Cir. 2018)..............................50
*Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) .......................................63
*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734 (Fed. Cir. 2016)...................................................................................................71
*PPC Broadband, Inc. v. Iancu*, 739 F. App'x 615 (Fed. Cir. 2018) ........................74
*Rambus Inc. v. Rea*, 731 F.3d 1248 (Fed. Cir. 2013) ............................................70
*Skky, Inc. v. MindGeek,* s.a.r.l., 859 F.3d 1014 (Fed. Cir. 2017)............................50
*WBIP, LLC v. Kohler Co*., 829 F.3d 1317 (Fed. Cir. 2016) ...................................71
*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356 (Fed. Cir. 2012) ...........................................................................................................70
*World Bottling Cap, LLC v. Crown Pkg. Tech., Inc*., Case IPR105-01651 (Final Written Decision) (PTAB Jan. 19, 2017) .........................................................11

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..........................................................................................1
35 U.S.C. § 103 ........................................................................................................42
35 U.S.C. §141 ..........................................................................................................1
35 U.S.C. §141(c) .......................................................................................................1
35 U.S.C. §319 ...........................................................................................................1
37 C.F.R. § 42.100(b) ...............................................................................................63

## STATEMENT OF RELATED CASES UNDER FED. CIR. R. 47.5

Cross-Appellant Team Worldwide Corporation states as follows:

1. There have been no previous appeals for the *Inter Partes* Reviews of the '394 Patent in these cases.
2. The patent at issue, U.S. Patent No. 7,246,394 ("the '394 Patent"), is the subject of the following related and pending proceedings in the United States District Court for the Eastern District of Texas (collectively, the "EDTX Litigations"):
   - *Team Worldwide Corporation v. Macy's, Inc. & Macys.com, LLC,* No. 2:19-cv-00099-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Target Corporation and Target Brands, Inc.,* No. 2:19-cv-00100-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. The Home Depot, Inc.,* No. 2:19-cv-00098-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Dick's Sporting Goods, Inc.,* No. 2:19-cv-00097-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Costco Wholesale Corporation,* No. 2:19-cv-00096-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Bed Bath & Beyond, Inc.,* No. 2:19-cv-00095-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Amazon.com, Inc. and Amazon.com LLC,* No. 2:19-cv-00094-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Ace Hardware Corporation,* No. 2:19-cv-00093-JRG (E.D. Tex.);
   - *Team Worldwide Corporation v. Academy, Ltd. d/b/a Academy Sports + Outdoors*, No. 2:19-cv-00092-JRG (E.D. Tex.); and
   - *Team Worldwide Corporation v. Sears, Roebuck and Co., Sears Holdings Corporation, and Transform Holdco LLC,* No. 2:20-cv00006 (E.D. Tex.).
3. Intex and Bestway appealed the Board's decision in IPR2018-00871 (20-1143), but the appeal was not pursued.
4. An opening Appellant's Brief on an appeal of the decision in IPR2018-00875 (20-1147) was filed in this Court on April 29, 2022.

## I. JURISDICTIONAL STATEMENT

This is a cross-appeal pursuant to 35 U.S.C. §141(c) from the decisions from the Patent Trial and Appeal Board ("PTAB" or "Board") of the United States Patent and Trademark Office ("USPTO") for IPR2018-00870[1] (entered on September 12, 2019, Appx000005-000135), IPR2018-00874 (entered on October 25, 2019, Appx000407-000545) and portions of IPR2018-00871 (entered on September 12, 2019, Appx000140-000273) for the '394 patent. This brief also presents remarks in support of the Board's Final Written Decisions in IPR2018-00872 (entered on September 11, 2019, Appx000274-000346) and IPR2018-00873 (entered on October 18, 2019, Appx000347-000403). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§141 and 319 for the above matters.

## II. STATEMENT OF ISSUES

For TWW's Responsive Brief:

1. The Board did not err in concluding that Miller did not meet the "air conduit" limitation of the '394 Patent as Petitioners[2] presented no persuasive reasons for modifying Miller in view of Scott.

---

[1] See table on pp. 6-7 *infra* providing a cross-reference for IPRs to appeals.
[2] As used herein, "Petitioners" refers to Intex Recreation Corporation and Bestway (USA) Inc. who were the Petitioners on each appealed IPR. "Appellant" refers to Intex Recreation Corporation that appealed the IPR decisions in Case Nos. 20-1141, 20-1142, and 20-1143.

2. The Board did not err in concluding that Parienti did not disclose the “built into” limitation as the Board’s application of its claim construction to Parenti was proper.

For TWW’s Cross-Appeals:

1. Did the Board err in determining that Chaffee discloses a housing that is “built into” an “inflatable body” such that combinations involving Chaffee in Case Nos. 20-1149, 20-1150, and 20-1151 would not meet the “built into” limitations and therefore would not support the Board’s findings of obviousness?
2. Did the Board err in ignoring that Chaffee’s original disclosure and prosecution history show the “extend from” phrase of Chaffee does not teach a one-piece flange and pump housing such that combinations involving Chaffee in Case Nos. 20-1149, 20-1150, and 20-1151 would not meet the “built into” limitations and therefore would not support the Board’s findings of obviousness?
3. Did the Board err in construing the term “inflatable body” as not including “substantially airtight” in the construction such that combinations involving Wu in Case Nos. 20-1149 and 20-1151 would

not meet the “inflatable body” limitations and therefore would not support the Board’s findings of obviousness?

4. Did the Board err in determining that Goldsmith discloses a housing that is “built into” an “inflatable body” and therefore the combinations involving Goldsmith in Case Nos. 20-1149 and 20-1150 would not support the Board’s finding of obviousness?

5. Did the Board err in not finding sufficient secondary considerations of nonobviousness for the ’394 Patent to overcome the obviousness determinations in Case Nos. 20-1149, 20-1150, and 20-1151?

## III. STATEMENT OF THE CASE

### A. Introduction

This brief addresses five different IPRs filed against U.S. Patent No. 7,246,394 (“the ’394 Patent”) by Petitioners Intex Recreation Corporation and Bestway (USA), Inc. In each of the five IPRs, Petitioners conceded in their petitions that there is no anticipating prior art reference, instead arguing that the claims should be invalid as obvious in light of various combinations of prior art. Pursuant to this Court’s Order in Case No. 20-1141, this brief presents TWW’s responsive

arguments to Appellant Intex's opening brief for Case Nos. 20-1141 and 20-1142,[3] and its cross appeal arguments for Case Nos. 20-1141, 20-1142, and 20-1143.

**1. Case Nos. 20-1141, 20-1142, and 20-1143 – Responsive Brief**

In Case Nos. 20-1141, 20-1142, and 20-1143[4], Team Worldwide Corporation ("TWW") prevailed with a finding confirming validity and no obviousness. These findings were correct and should be affirmed.

In the IPRs at issue in Case Nos. 20-1141 and 20-1142, the Board correctly concluded that Petitioners Intex and Bestway had failed to show that the Miller reference could be combined with Scott to satisfy the "air conduit" limitation of the '394 Patent. Also, the Board correctly applied its construction of "built into" to determine that the Parienti reference did not disclose a housing "built into the inflatable body" and the Board properly rejected Petitioners late argument concerning the composition of the housing in Parenti, *i.e.,* pipe 9 is not included in the alleged "housing." Appx000379-000380.

**2. Case Nos. 20-1149, 20-1150, and 20-1151 – Cross-Appeals**

In Case Nos. 20-1149, 20-1150, and 20-1151, the Board found the challenged '394 Patent claims invalid as obvious. For the cross appeals, the Board erred as none

---

[3] Although Appellant Intex filed Case No. 20-1143, Appellant did not address this case in its Opening Brief.

[4] Intex filed these three appeals. Bestway, a petitioner below for these IPRs did not join the appeals.

of the obviousness combinations render any ’394 Patent claim(s) invalid as obvious, and the Board further erred in its secondary considerations analysis. So even if obviousness were to be found, it does not apply to the ’394 Patent claims because a commercial embodiment of those claims was wildly successful.

As discussed below, the Board relied on one or more of three prior art references – Chaffee, Wu, and Goldsmith – for every appealed ground. Because these references fail to disclose the limitations of the ’394 Patent, none of the appealed grounds render the claims of the ’394 Patent claims obvious.

The Board relied on the Chaffee reference to disclose the “built into” limitation of the claims; however, Chaffee does not meet the Board’s construction for this limitation of “integrated into and not detachable from” because the housing in Chaffee is designed to be removable. For the Wu and Goldsmith references, the Board improperly construed the limitation “inflatable body” by excluding the requirement that an “inflatable body be “substantially airtight” - which two district courts included in their construction of this same term. Properly construed, neither Wu nor Goldsmith meet the “inflatable body” limitation.[5]

---

[5] Also as discussed below, a POSA would not have been motivated to combine the alleged prior art combinations relied upon by the Board. In addition, the Board erred in not finding that the secondary considerations of nonobviousness outweighed its other findings of obviousness as TWW presented substantial evidence of commercial success.

## B. Background

TWW was founded in 1972 and is a leading manufacturer and provider of premium inflatable products. TWW's founder Tony Wang is the named inventor on over 100 patents worldwide that have been assigned to TWW, encompassing products such as air beds, self-inflating pads, camping mats, pools, water floats, inflatable furniture, inflatable toys and more. TWW makes air beds for many well-known U.S. brands such as Serta®, Insta-Bed® and EZ-Bed®. TWW is the assignee of the '394 Patent entitled "Inflatable Product with Built-In Housing and Switching Pipe" that is the subject of the instant Appeals.

Prior to the '394 patent, no one had ever made an airbed with a built-in pump that used a moveable conduit to allow for both powered inflation and deflation. In fact, TWW invented the airbed with a built-in pump, which became a new category of airbed that came to dominate the market for the next two decades.

Given the complexity of the rulings in five different IPRs, TWW presents the following table as to what each appeal relates to, including which prior art references and combinations are at issue on appeal, as well as the Board's findings:

| Appeal No. | IPR | Obviousness Grounds | Decision | Party Appealing |
|---|---|---|---|---|
| 20-1141 | 2018-00872 | Miller + Scott + Wu | Not unpatentable | Intex |
| | | Miller + Scott + Pisante | Not unpatentable | |
| 20-1142 | 2018-00873 | Parienti + Renz | Not unpatentable | Intex |
| | | Parienti + Wu | Not unpatentable | |

| Appeal No. | IPR | Obviousness Grounds | Decision | Party Appealing |
|---|---|---|---|---|
| 20-1149 | 2018-00870 | Wu + Chaffee | Unpatentable as obvious - claims 1-12 and 16-23 | TWW |
| | | Wu + Goldsmith | Unpatentable as obvious - claims 1-12 and 16-23 | |
| 20-1150 | 2018-00871 | Walker + Chaffee | Unpatentable as obvious- claims 1–3, 7–12, 16–18, 22, and 23 | TWW |
| | | Walker + Goldsmith | Unpatentable as obvious - claims 1–3, 7–12, 16–18, 22, and 23 | |
| 20-1151 | 2018-00874 | Chaffee + Wu | Unpatentable as obvious - claims 1-12 and 16-23 | TWW |
| | | Chaffee + Scott + Pisante | Unpatentable as obvious - claims 1-12 and 16-23 | |

As explained below, none of the above combinations of references disclose a pump built into an inflatable body with a moveable conduit used in one position for inflation and another for deflation. As a result, the Board's findings should have been consistent across all IPRs that the '394 patent claims are not obvious. Additionally, although the Board agreed that there is a nexus between the '394 patent claims and the enormous commercial success – over Finance Info in sales - of products embodying the claimed inventions, the Board incorrectly found the nexus weak and

incorrectly failed to find that secondary considerations show the claims to be not obvious. TWW respectfully requests the Court confirm the Board's findings of non-obviousness and reverse its findings of obviousness and also as to secondary considerations.

### C. Summary of the '394 Patent

The '394 Patent is generally directed to an inflatable product such as a mattress provided with an electric pump and a moveable conduit to allow for both powered inflation and deflation. Appx000546, 1:13–15. In conventional prior art inflatable mattresses, the mattress had to be inflated either manually or by way of an external electric pump. However, carrying a separate electric pump is inconvenient and cumbersome. Therefore, a primary objective of the '394 Patent is to provide an improved air mattress having a built-in electric air pump and a moveable conduit to allow for both powered inflation and deflation. Appx000546-000585, 1:16–28.

FIGS. 3A–3D of the '394 Patent show one embodiment of the invention covered by the claims of the patent. The device includes a housing 31, a fan and motor 33, a switching pipe 32, a flap 36, and a cover 35. Appx000546-000585, 4:13–16.




FIG. 3B

During inflation, the switching pipe 32 is connected to the air outlet 312 on the top surface of the housing 31. The cover 35 is removed from the air intake 311. The inflatable product (not shown) is inflated by the fan and motor. Air flows through the air intake 311 and the air outlet 313, and into the inflatable product.

Appx000546-000585, 4:22–28.

The deflation operation is depicted in FIG. 3D:




FIG. 3D

During deflation, the switching pipe 32 is switched from the air outlet 312 to the air intake 311 on the top surface of the housing 31. Also, the flap 36 follows the switching pipe 32 to rotate to close the air outlet 313 on the bottom surface of the housing 31. The air in the inflatable product is evacuated by the fan and motor 33. The path of the airflow is indicated by arrows. Air flows through the air intake 314, the switching pipe 32 and the air intake 311, and into the housing 31. Then, air flows out from the air outlet 312.

Appx000546-000585, 4:29–38.

TWW's expert, Dr. Stevick, reviewed airbed models that practice the TWW '394 Patent claims. Based on his review of airbeds in the market, Dr. Stevick

determined that those models with built-in pumps are a separate market segment in which, subsequent to the TWW patents including the ’394 patent, imitators appeared throughout the industry. Appx017973 at ¶220, *see* also Appx017967-017995 at ¶¶211-235. Sales of these patented airbeds by [redacted] alone have exceeded [redacted] *See* Appx000082, Appx000207, Appx000476, Appx000478, Appx001070, Appx001074, Appx001313, Appx001320, Appx002203, Appx002451, Appx002458, Appx003136, Appx003383, Appx003391, Appx004104, Appx004362, Appx005185, Appx005433, Appx007926, Appx010008, Appx010754, Appx018287-018288, Appx017971, Appx018294, Appx018604-018605, Appx018611, Appx018906-018907, Appx018913, Appx019114, Appx019128, Appx019166, Appx019180, Appx019218, Appx019232, Appx019270, Appx019284, Appx019322, Appx019336.

The industry continues to grow, showing commercial success. *See World Bottling Cap, LLC v. Crown Pkg. Tech., Inc.*, Case IPR105-01651 (Final Written Decision) (PTAB Jan. 19, 2017), at 20.

## IV. STATEMENT OF FACTS

### A. ’394 Patent – Claim Construction

The terms “inflatable body” and “built into” are used in each challenged claim: independent claims 1 and 16 and dependent claim 2-12 and 17-23.[6] The Board’s final construction is that “inflatable body” means “a structure that expands when filled with air or other gases”; “built in” means “integrated into and not detachable from” or as stated in IPR2018-00872, “integrated into and not detachable (or readily removed) from.” Appx000016, Appx000024, Appx000159, Appx000025, Appx000160, Appx000295, Appx000358, Appx000418.[7]

### B. ’972 Patent – Chaffee (U.S. Patent No. 7,039,972)

The Board relied on the Chaffee reference in grounds in all three cross appeals – Case Nos. 20-1149, 20-1150, and 20-1151 – as allegedly disclosing the “built into” limitation of the ’394 Patent. However, Chaffee is directed to an inflatable device with a removable fluid controller which would therefore not be “bult into.” Appx006939, Chaffee, Abstract.

As shown in FIGs. 3 and 5 (below), Chaffee discloses a “fluid controller” assembly 80 which includes a retaining structure and a pump. The retaining structure includes wall 83 and flange 82 (both highlighted in green below). Appx006949,

---

[6] TWW’s arguments herein apply equally to independent claims 1 and 16 and dependent claims 2-12 and 17-23.

[7] For these appeals TWW is only challenging the Board’s construction of “inflatable body.”

Chaffee, 5:4–9. The pump (including a motor and fan) is contained within housing 90 (highlighted in orange below). Appx006948 and Appx015159, Chaffee, 4:15–22.

Flange 82 provides the connection point to the bladder 20. Flange 82 is separate from the housing 90 and the two are preferably reversibly connected to allow for the removal of the fluid controller 80 for repair or replacement. Appx006949 and Appx015160 at 5:33-48.




Fig. 3




Fig. 5

Chaffee does not disclose any embodiment where pump housing 90 is "built into" bladder 20. Chaffee discloses two possibilities for how fluid controller 80 may connect to bladder 20. In the first embodiment, wall 83/flange 82 (shown in green) are a unitary structure which is permanently connected to bladder 20. In this first embodiment, housing 90 is ***removably*** connected to wall 83, thus permitting the pump to be removed for servicing or replacement. In the second embodiment, other parts of "fluid controller 80" (such as wall 83) are removably connected to bladder

20 such as via flange 82 and held in place, for example, by retaining strap 22. In this second embodiment, because other parts of fluid controller 80 can be disconnected, the pump housing 90 (which is shown in the figures as attached to wall 83) can likewise be removed for servicing or replacement. In either case, the reversible connection allows the removal of either the pump itself (housing 90) or the entire fluid controller 80 (housing 90 and the wall 83) for repair or replacement, preventing the entire inflatable device from having to be disposed of in the event of a failure of one component. Appx006949, Chaffee, 5:41–48. Thus, Chaffee describes two embodiments: (1) pump housing 90 removably or reversibly engages with wall 83, and (2) the fluid controller (including, for example, wall 83) is removably connected to bladder 20 (for example, via flange 82), which likewise allows the pump housing to be removed from bladder 20.[8]

### C. ’067 Patent – Goldsmith (U.S. Patent No. 2,493,067)

The Board relied on the Goldsmith reference as allegedly disclosing the “housing built into the inflatable body” limitation of the ’394 Patent claims for Case Nos. 20-1149 and 20-1150. Goldsmith is directed to an improved inner spring mattress which circulates air into the inner compartment of the mattress and out through outlets to heat or cool a person laying on the mattress. *See* Appx006947 at

[8] Notably, the patent specification expressly states that either “two portions of fluid controller 80” are reversibly connected, or “bladder 20 and fluid controller 80” are reversibly connected. Appx006949, at 5:40-43.

1:1–19, Appx006948 at 3:1–13 and 3:29–47. Air flows into air compartment 17 and out through outlet ports 19 and through the pores of a fibrous glass material 18. Appx006948 at 3:38–45 and 4:22–26. The Goldsmith mattress is designed to emit air and is not substantially airtight:




Figure 6 of Goldsmith is reproduced below:




Figure 6 depicts a "sectional view showing a modified form of air distributing chamber which forms a part of th[e] invention." *Id.* at 2:30–32. The alternative

embodiment depicted in Figure 6 includes, among other aspects, motor 39 and fan 40 inside distribution casing 42, which is "mounted or attached to the mattress" previously described. *Id.* at 4:1–5. Goldsmith states: "With this form set [shown in Figure 6] within the mattress, no outside [blower] unit is necessary." *Id.* at 4:11–12.

### D. '046 Patent – Wu (U.S. Patent No. 6,698,046)

The Board relied on the Wu reference as allegedly disclosing the "inflatable body" limitation of the '394 Patent for Case Nos. 20-1149 and 20-1151. Wu is directed to "a system for supplying air and controlling the flow of air into and out of the chambers of a patient supporting mattress." *See* Appx006929, Abstract. The system is shown generally in FIG. 1:




FIG.1

Figure 1 depicts a schematic representation of the overall disclosed system 10, which includes, among other aspects, electric motor-powered blower 15, two-position rotary valve 100, and air mattress supply lines 302A–D and 302S for supplying air to air mattress 400. Appx006933-006934 at 2:43–48. Included in rotary valve 100 is gate member 200, which is shown in Figure 1 "in a first position for directing air flow in a pressurizing mode." *Id.* at 3:3–8. Wu discloses that "[w]hen gate member 200 is in the first position, air can flow through inlet port 110 of housing 101, into the second portion of gate member 200 and then out through air mattress supply ports 112S, 112A, 112B, 112C and 112D and exhaust port 114." *Id.* at 5:56–60. The air mattress 400 "has a large number of small holes in its upper surfaces to permit air to constantly circulate around a supported patient." Appx006933 at 2:59–62.

### E. '344 Patent – Walker (U.S. Patent No. 4,890,344)

The Board relied on the Walker reference in Case No. 20-1150 as allegedly disclosing the "air conduit" limitation. Walker is directed to an external air supply and control apparatus having an air pump and hand controls for supplying air under pressure to an air mattresses and adjusting the pressure of the air in the mattress. *See* Appx001829-001833, Appx009886-009887, Appx010041-010043, and Appx006987 at 1:20–23. The device is shown generally in FIG. 1:




### F. ’377 Patent – Miller (U.S. Patent No. 5,529,377)

The Board found that the Miller reference did not disclose the “air conduit” limitation as proposed by Petitioners. Miller is generally directed “to automotive seats that include air cells to adjust the comfort of the seat.” Appx007127-007134. Miller describes an air cell module 14 for an automotive seat 10 that is mounted on a backplate 62 or other suitable support of an automotive seat back 12. *See* Appx007127-007134.

Miller’s FIGS 2 and 3 are below:




Fig. 2




Fig. 3

Figure 2 depicts "a front view of the air cell module" of the embodiment of Miller's Figure 1 and Figure 3 depicts "an enlarged, partially sectioned side view of the air cell module shown in [Figure] 2." Appx007127-007134, 2:64–67. Air cell module 14 also includes an electric motor driven air pump subassembly 24, which is disposed inside air cell 20, and which is operatively connected to the air tube 22. *Id*., 3:31–38. "The air cell is preferably inflated and deflated by a pump system that uses a reversible electric motor and air pump and a single solenoid valve that are controlled by a two-position switch." *Id.* at 4:27–30.

### G. ’960 Patent – Parienti (U.S. Patent No. 6,018,960)

The Board found that the Parenti reference did not disclose the “built into” limitation of the ’394 Patent as proposed by Petitioners. Parienti is directed to an automatically inflatable and foldable solar-powered cooler mattress. Appx006955, Title & Abstract. It includes an inflatable mattress and an “auxiliary device for automatic inflating and deflating of the mattress.” Appx006955 and Appx006959, Abstract, 1:22–24. The auxiliary inflating/deflating device is attached to the exterior surface of the mattress by gluing or other means. Appx006955 and Appx006959, Abstract, 1:24-25. The device is shown generally in annotated FIG. 1, with colors and labels added for the inflating/deflating device including a pump portion (gray) and an array of photovoltaic cells (yellow).




Appx006956, Parienti, FIG. 1 (annotated).

Annotated FIG. 8 shows another view of the mattress with color and labels added to identify the pump portion and the array of photovoltaic cells:



Appx006958, Parienti, FIG. 8.

FIG. 4 shows a protective grid 8[9] for allowing ambient air flow, an array of photovoltaic cells 1 for powering a motor 2 that in turn drives a turbine 4. FIG. 4 also shows a pipe 9 that allows air flow into the mattress. As seen in FIG. 4, pipe 16 is between pipe 9 and the auxiliary device:




Fig. 4

Appx006959-006960, Appx006956-006957, Parienti, 1:20–47, 2:55–3:6, 3:20–29; FIGS. 1, 4, 5; Abstract. As shown above, FIGs. 1 and 8 show the device of FIG. 4 attached to the outside of the mattress.

FIG. 5 shows a plan view of the device of FIG. 4 with a portion of the array of photovoltaic cells 1:

[9] As the Board noted, FIG. 4 depicts protective grid 8 incorrectly. Appx000257. FIG. 5 below correctly shows protective grid 8.




Fig. 5

Appx006957, Parienti, FIG. 5.

**H. ’528 Patent – Scott (U.S. Patent No. 4,938,528)**

Scott is directed to a vehicle seat assembly for adjustable seat support that is inflated and deflated by a uni-directional pump. *See* Appx007116-007126 and Appx007121-007122 at Abstract; 2:60–62. The Board applied the Scott reference in two different IPRs that were appealed for the “air conduit” limitation of the ’394 Patent. In the 20-1141 case, the Board determined that a POSA would not combine Scott with Miller and other references to disclose the movable “air conduit” inflation/deflation limitation of the ’394 Patent. In the 20-1151 case, the Board found that a POSA would combine Scott with Chaffee to disclose the moveable “air conduit” inflation/deflation limitation of the ’394 patent. But the Board also determined that Scott with Chaffee still did not meet the additional limitation that the “air conduit” must be a “pipe” in dependent claims 4-6 and 19-21.

In Scott, the adjustable seat support includes an inflatable bladder 22 that is connected to a non-reversible air pump 30. The air pump 30 has an air outlet 32 and

an air inlet 34. The bladder is connected to the pump outlet 32 by an outlet conduit 36. During deflation, an inlet conduit valve 42 and pump outlet valve 44 are both actuated to their open positions, enabling the pump 30 to vent air from the bladder 22 and exhaust the air to atmosphere. Appx007123 at 3:36–50. The system is shown generally in FIGs. 1-3:




### I. ’825 Patent – Pisante (French Patent No. 2583825)

Pisante is directed to a miniaturized, hand-operated device that can alternately function as a blower or for suction for cleaning up powdery substances and the like. *See* Appx007820-007857. The Board relied on Pisante, in combination with Chaffee

or Chaffee and Scott, as allegedly disclosing the "air conduit" limitation as that limitation is further specified in dependent claims 4-6 and 19-21 of the '394 Patent. Also, the Board relied on Pisante in combination with Chaffee and Scott as allegedly disclosing the airflow pathways limitation of dependent claims 8, 9, and 11.

The device of Pisante is shown generally in FIG. 2:




In operation, when button 12 is pushed, a motor is activated. An operator's thumb can manipulate the serrated chuck 17 which causes rotation of an internal three-way valve 15. The valve 15 comprises an inner channel 19 that, as represented in FIG. 3 below, puts tube 13 in communication with pressurized area 8, thereby causing suction. In FIG. 4, the barrel 18 is rotated so that the inner channel 19 puts tube 13 in communication with outlet 9, thereby causing the device to act as a blower. Appx07848 at 5–29.




Appx000506.

## V. SUMMARY OF THE ARGUMENT

Tony Wang, founder of Team Worldwide (TWW), one of the world's biggest inflatable manufacturers, invented the "built-in pump" airbed with more than 100 patents to his name. Before TWW patented its built-in pump airbed designs in multiple patents including the '394 Patent, there were no airbeds with pump assemblies built into the airbed sidewall, particularly none that followed the claims of the '394 patent. That is why Petitioners did not assert anticipation against any of the '394 patent claims. None of the prior art Petitioners relied upon included pumps built into airbeds. Chaffee did not describe any such airbed, and neither did Walker,

Goldsmith or Wu, the primary prior art references the Board relied on in finding claims 1-12 and 16-23 of the '394 Patent obvious. Chaffee never disclosed a built-in pump, instead describing only the opposite: a reversibly connected pump detachable from the air mattress bladder to allow for repair or replacement of the pump without having to replace the entire airbed. Goldsmith discloses an inner spring mattress that vents air through outlets to heat or cool the person lying on the mattress but fails to disclose inflating and deflating or a built-in pump. Wu discloses an external variable speed blower and air mattress supply lines for continuously supplying air to an air mattress with holes designed to create a flow of air around the patent lying on the air mattress, but no built-in pump. Only Tony Wang had the idea of a permanently integrated, built-in pump assembly, and that idea spawned an entirely new category of airbeds.

The Board understood that Mr. Wang invented a novel design when it rejected several of Petitioners' obviousness arguments. Those findings should be affirmed on appeal. Inconsistently, in three of the five IPRs on appeal here, the Board made certain errors as to claim construction and in reviewing disclosures in prior art patents that caused the Board to erroneously find that certain prior art combinations rendered the claims at issue obvious. In so doing, the Board also failed to apply the correct standard to the issue of secondary considerations. These erroneous findings

should be reversed and the validity of all claims of the ’394 patent should be confirmed by this Court.

Response to Intex/Bestway Opening Brief for Case Nos. 20-1141 and 20-1142

In Case Nos. 20-1141 and 20-1142 the Board concluded that the prior art did not render claims 1-12 and 16-23 of the ’394 Patent obvious:

With respect to the Miller combinations:

The Board did ***not*** err in its determination that claim 1 is not obvious over Miller in view of Scott and Wu or Pisante in Case No. 20-1141 as Intex’s arguments are based on hindsight and teachings not present in the references.

With respect to the Parenti combinations:

The Board also did ***not*** err in its determination that claim 1 is not obvious over Parienti in view of Renz or Wu in Case No. 20-1142 as the Board’s construction and application of the construction to Parienti was correct.

Cross Appeals for Case Nos. 20-1149, 20-1150, and 20-1151

While the Board understood in the above cases that the inventions of the claims of the ’394 patent are novel and not obvious, on other IPR grounds the Board made errors that led it to incorrectly invalidate the claims as purportedly obviousness—they are not. As explained below, the Board’s decisions in Case Nos.

20-1149, 20-1150, and 20-1151 contain numerous errors involving claim construction and related findings. The table below summarizes the appealed grounds for which the Board found obviousness.

| **Appeal No. (IPR)** | **Obviousness Grounds** | **Key Limitations Board Found Purportedly Disclosed** | **Erroneous Findings by the Board**[10] | | |
|---|---|---|---|---|---|
| | | | **Chaffee ("built into")** | **Wu ("inflatable body")** | **Goldsmith ("built into the inflatable body")** |
| 20-1149 (2018-00870) | Wu + Chaffee | • "Inflatable body" – Wu<br>• "Built into" – Chaffee<br>• "air conduit" moveable for inflation/deflation – Wu modified by Chaffee | X | X | |
| | Wu + Goldsmith | • "Inflatable body" – Wu<br>• "Built into" – Goldsmith<br>• "air conduit" moveable for inflation/deflation – Wu modified by Goldsmith | | X | X |
| 20-1150 | Walker + Chaffee | • "Inflatable body" – Walker | X | | |

[10] If the Court finds that any one of the indicated findings are incorrect then that ground of obviousness must be reversed.

| **Appeal No. (IPR)** | **Obviousness Grounds** | **Key Limitations Board Found Purportedly Disclosed** | **Erroneous Findings by the Board[10]** | | |
|---|---|---|---|---|---|
| | | | **Chaffee ("built into")** | **Wu ("inflatable body")** | **Goldsmith ("built into the inflatable body")** |
| (2018-00871) | | • "Built into" – Chaffee<br>• "air conduit" moveable for inflation/deflation – Walker | | | |
| | Walker + Goldsmith | • "Inflatable body" – Walker<br>• "Built into" – Goldsmith<br>• "air conduit" moveable for inflation/deflation – Walker | | | X |
| 20-1151 (2018-00874) | Chaffee + Wu | • "Inflatable body" – Chaffee<br>• "Built into" – Chaffee<br>• "air conduit" moveable for inflation/deflation – Chaffee modified by Wu | X | | |
| | Chaffee + Scott + Pisante | • "Inflatable body" – Chaffee<br>• "Built into" – Chaffee<br>• "air conduit" moveable for inflation/deflation | X | | |

| **Appeal No. (IPR)** | **Obviousness Grounds** | **Key Limitations Board Found Purportedly Disclosed** | **Erroneous Findings by the Board[10]** | | |
|---|---|---|---|---|---|
| | | | **Chaffee ("built into")** | **Wu ("inflatable body")** | **Goldsmith ("built into the inflatable body")** |
| | | – Chaffee modified by Scott (and Pisante for cls. 4-6, 8, 9, 11, 19-21) | | | |

With respect to Chaffee:

The Board erroneously concluded that Chaffee discloses a housing that is "built into" the "inflatable body" because the housing purportedly was "integrated into and not detachable from" the "inflatable body" as required by the Board's construction of "built into." But Chaffee discloses only a reversible connection between the pump housing (either itself or with other elements) and bladder 20 such that the pump housing is never "built into" the inflatable body.

In reaching its conclusion, the Board cited no figures or description in the specification disclosing that the fluid controller is integrated into and non-detachable as required to meet the "built into" limitation. The Board also ignored that Chaffee's original disclosure and prosecution history show the "extend from" phrase of Chaffee (which the Board relied on) does not teach a permanent connection between the pump housing and the bladder 20. Rather, in every embodiment Chaffee teaches

away from building the fluid controller into the bladder and instead discloses that the pump housing be reversibly connected to bladder 20.

With respect to Wu:

The Board concluded that Wu disclosed the "inflatable body" limitation of the '394 Patent because Wu allegedly met the Board's construction of "a structure that expands when filled with air or other gases." But the Board erred in construing the term "inflatable body" by not requiring that an "inflatable body" be "substantially airtight" as construed in District Court. As a result of this error in claim construction, the Board incorrectly found that Wu disclosed an "inflatable body," when Wu in fact discloses a large number of small holes in the air mattress causing air to flow from the air mattress around a person lying on the air mattress.

With respect to Goldsmith:

The Board concluded that Goldsmith disclosed the "housing built into the inflatable body" limitation of the '394 Patent because Goldsmith allegedly met the Board's construction of "inflatable body" as "a structure that expands when filled with air or other gases." But the Board erred because Goldsmith does not have an "inflatable body" as it discloses a conventional spring mattress with holes or ports to allow air to flow through the surface of the mattress, not an "inflatable" air mattress. Moreover, Goldsmith is not directed to inflatables at all.

With respect to all obviousness combinations:

The Board concluded that TWW's evidence of secondary considerations weighed only slightly in favor of nonobviousness. But the Board erred in its determination as it ignored significant evidence of commercial success of airbeds practicing the '394 Patent.

With respect to motivation to combine:

The Board erred in finding that a POSA would be motivated to combine the references identified in each appealed ground. Even if the Court found a motivation to combine, none of the combinations of references disclose all the limitations of the claims of the '394 Patent.

## VI. ARGUMENT – RESPONSIVE BRIEF

### A. The Board Did Not Err Regarding Miller (IPR2018-00872)

For Case No. 20-1141, the Board correctly determined that combining the Miller reference with the Scott reference does not teach the air conduit limitation of the claims of the '394 Patent and, thus, the grounds involving Miller and Scott do not render the claims of the '394 Patent obvious.

For the '394 Patent limitation "an air conduit disposed at least in part in the housing," the Board concluded that Petitioners had failed to provide persuasive reasons for combining Miller with the Scott reference. Specifically, Petitioners failed to explain why a POSA would be motivated to locate Scott's directional valve (which is outside the housing in Scott) in Miller's housing such that the air conduit

would be at least in part in the housing. The Board found that Miller teaches away from locating a directional valve, such as Scott's valve, inside Miller's housing as Miller teaches locating its air valve outside the housing. Moreover, the Miller reference itself teaches against such a substitution as Petitioners proposed for Miller and Scott.

### 1. For the Miller and Scott Combination, the "Air Conduit" is Not "Disposed at Least in Part in the Housing" as Required by the '394 Patent as Petitioners Admit Miller's Valve is Located Outside the Housing

Claims 1 and 16 of the '394 Patent recite an "air conduit disposed at least in part in the housing." TWW has maintained, and the Board has agreed, that "[n]either Miller nor Scott nor the combination of Miller with Scott teaches an air conduit disposed at least in part in the housing." Appx000314, Appx002651, Appx003107, Appx003562.

Petitioners acknowledge that Miller did not disclose the required "air conduit disposed at least in part in the housing" of the '394 Patent. The Board concluded that a POSA would not be motivated to combine Miller and Scott to disclose the required "air conduit…." In arguing why a POSA would combine Miller and Scott, Appellant's Opening Brief equates Miller's valve 50 with Scott's directional valve 68. *See* App. Open. Brief at 34. Further, the Opening Brief reproduces Figure 2 of Miller, shown below, clearly depicting Miller's valve 50, shown circled in red as

being located outside "air cell 20," and air pump subassembly 24 (which includes housing 26).




App. Open Brief at 35 showing annotated Miller Fig. 2.

The Board correctly found "that Petitioners do not provide persuasive reasons, with rational underpinnings, for locating Scott's valve 68 in Miller's housing 26." Miller defines a system with an air valve 50 located outside of air cell 20 and air pump 24 (including pump housing 26) as shown above in reproduced Figure 2 of Miller. Appx007132. As stated by the Board concludes that "solenoid valve 50 is disposed outside the air cell 20 and connected to the exterior end of the air tube 22 to control the flow of air to and from the air cell 20." Appx000326, Appx002663, Appx0003574. Because Miller's valve 50 is ***outside*** the "housing," the Board

properly concluded there was no rational basis for putting Scott's directional valve 68 inside the housing.

### 2. The Miller Reference Itself Argues Against Substitution

Appellant then argued that "a person having ordinary skill in the art would have had reason to substitute vane pump 138 for Wankel pump 38" and that "a person having ordinary skill in the art (1) 'would have generally recognized rotary vane pumps like rotary vane pump 138 as being relatively 'smaller and lighter,' which 'permits the overall [pump] to be of smaller size and weight for ease of transportability and installation.'" Appx000308, Appx002645, Appx002883, Appx003556, Appx014188.

However, the Miller reference itself argues against such a substitution, and the Board correctly concluded that "Miller expressly discloses that, with this substitution, rotary vane pump 138 would be located outside of the air cell." Appx000309 Appx002646, Appx003557. As disclosed by Miller, and cited by the Board, Fig. 6, reproduced below clearly shows pump 138 (circled in red) located outside air cell 120. Appx000309, Appx007130.




Therefore, even if the substitution suggested by the Appellant were to be made, the pump and valve would still be located outside of the housing. Thus, the Board correctly concluded "that Petitioners have not provided sufficient evidence and arguments to outweigh the express teaching of Miller to have rotary vane pump 138 outside of the air cell." Appx000309-000310, Appx002646-002647, Appx003557-003558.

### 3. Board Correctly Finds that Petitioners' Proposed Modifications to Miller are Unsupported

Appellant also argues that Miller could be modified to include the valve inside the housing by converting Miller from a reversible pump to a uni-directional pump by using directional valve 68. Appellant further argued that a POSA would have maintained Miller's pump housing "such that the movable air conduit (i.e., such as Scott's valve 68) was disposed inside Miller's housing 26." Appx000314,

Appx002651, Appx003562. Appellant alleged that "a person having ordinary skill in the art would have had 'several reasons' to maintain the housing – compactness, durability, and decreased manufacturing costs." Appx000327. Further, Appellants' expert, Dr. Beaman testified that "dispos[ing] the valve, like Scott's valve 68, inside of Miller's housing 26 … would have promoted the ***spatial efficiency*** … and ***durability***." Appx000328, Appx002665, Appx003576, Appx006141, emphasis in original.

The Board rejected the proposed modification regarding spatial efficiency as follows:

> As to spatial efficiency, we find that this reasoning is not supported by a rational underpinning. First, we agree with Patent Owner that Miller's disclosure of "plenty of room" is in the context of small electrical components. See Ex. 1213, 4:9–12 ("The housing piece 28 also has plenty of room for the electric leads 34 as well as other electrical components such as capacitors that may be needed or desired."). Petitioners have not provided persuasive evidence that, even with a smaller motor, Petitioners' proposed modification that includes a directional valve and its control components, would allow for any space savings.
>
> Appx000330, Appx002667, Appx003578.

The Board rejected the proposed modification regarding durability as follows:

> As to durability, we credit this reasoning to a small extent. Given that one function of a component housing is to protect the component (see

> Ex. 1206, 4:20), we credit Dr. Beaman's testimony with respect to added durability. See Ex. 1202 ¶ 210. This reasoning, however, is directed more to components in housings in the abstract, rather than directed specifically to Miller's system. For example, Petitioners do not direct us to persuasive evidence that, if located where valve 50 is located, a directional valve, such as Scott's valve 68, would be less durable than if positioned in a housing. Valve 50 is located inside a seatback, which would provide its own protection of the components. See Ex. 1213, Figs. 1, 2. That is, we do not discern any persuasive evidence that the durability of an air valve inside housing 26 would be significantly increased over one located outside the air cell but still within the seatback.
>
> Appx000331, Appx002668, Appx003579.

Appellants also ignore that valve 50 is "connected to electrical connector 54 through pigtail 52 with electrical leads 56," which would further inhibit moving valve 50 within the air cell 20 and would further require an additional tube to connect pigtail 52 to the outside atmosphere. Appx000327, Appx002664, Appx003575. *See* also reproduced Fig. 2 below.




Appx000327, Appx002664, Appx003575.

#### 4. Appellant Puts Forth Unsupported New Argument in its Opening Brief

Appellant now in its Opening Brief put forth for the first time an argument regarding Dr. Beaman's statement that "a POSA would have sought to retain this housing-contained pump design and doing so would have been well within a POSA's technical grasp." In addition, Appellant, for the first time in its Opening Brief, provides new cites to multiple references in support of Dr. Beaman's statement, "Walker (Appx6973–6995), Mogaki (Appx7229–7245), Grant (Appx7246–7256), Fujimoto (Appx7416–7429), and Gilroy (Appx7300–7311)." App. Opening Brief at 44.

While Dr. Beaman cited such prior art, the Petition never presented persuasive reasons or motivations to combine such art. Further the cited prior art discloses types of pumps or air bladders all of which are connected to external components:

- Walker, U.S. Patent No. 4,890,344 (Appx006973-006995), discloses an "air supply and control apparatus [that] has an air pump to supply air under pressure to air mattresses of an air bed" where the pump and air mattress are separated. Appx006973, Abstract.
- Mogaki, U.S. Patent No. 4,583,255 (Appx007229-007245), discloses a mat body with air chambers connect to an external remote controller 68, where the "remote controller 68 is detachably mounted in an opening formed in the front portion of the casing 23." Appx007242. Further, the pump, an "electromagnetic reciprocating compressor 25," is contained within the external "remote controller 68." Appx007235, Appx007242.
- Grant, U.S. Patent No. 5,232,353 (Appx007246-007256), discloses a pressurized diaphragm pump that may be connected to an external bladder. *See* Appx007246.
- Fujimoto, U.S. Patent No. 5,611,772 (Appx007416-007429), discloses an air massage device and a device body, where "the air-mat and device body are connected to each other by means of a wiring cable 2 and a hose bundle 3." Appx007424.
- Gilroy, U.S. Patent No. 5,103,518 (Appx007300-007311), discloses an alternating pressure pad connected an external controller unit, where

"controller 35 which can be used to operate pad 10 in both its alternating pressure relieving and body cooling modes of operation; the controller, as such, is not a part of this invention." Appx007310. The pump, "compressor 43" is an "air compressor is a double-acting, free piston air pump" contained within the external "controller 35." Appx007310.

The Board correctly found, based on at least the above factual findings, that claim 1 is patentable over Miller in view of Scott and Wu in stating that "[w]e determine, based on the complete record, that the information in the Petition fails to demonstrate, by a preponderance of the evidence, that claim 1 is unpatentable under 35 U.S.C. § 103 over Miller, Scott, and Wu." Appx000333, Appx002670, Appx003581

### B. The Board Did Not Err Regarding Parienti (IPR2018-00873)

For Case No. 20-1142, the Board correctly determined that Parienti does not disclose the "built into" limitation of the claims of the '394 Patent and, thus, the grounds involving Parienti do not render the claims of the '394 Patent obvious. The Board concluded that Parienti did not meet the Board's construction for "built into" of "integrated into and not detachable from" – a construction on which both sides agreed.

### 1. The Board Correctly Identified Petitioners' New Reply Argument for the "Built Into" Limitation in Parienti as Improper

The Board concluded that Petitioners argument made for the first time in its reply brief that Pipe 9 in Parienti was part of the housing in an attempt to meet the "built into" limitation was improper. "Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." Appx000373. "A reply that raises 'new theories or arguments necessary to make out petitioner's case-in-chief for the unpatentability of an original . . . claim' 'may not be considered.'" *Id.* The Board correctly noted that "in the Petition in this proceeding, Petitioner did not mention or rely on pipe 9 of Parienti as part of the basis for why the alleged 'housing' in Parienti … satisfies the 'built into' limitation." Appx000373. The Board also correctly notes that "[n]or did Petitioner explain why its proposed replacement of Parienti's 'pump device' with Renz's 'Uni-directional Pump Assembly' would retain Parienti's pipe 9 to satisfy the "built into" limitation." *Id.* The Board correctly stated that "a petitioner cannot present, in a reply, a new argument necessary for its case-in-chief. Appx000374. Similarly, Appellant cannot introduce this argument in appeal.

### 2. The Board Correctly Found the Improper Argument in the Reply Brief Still Failed to Show that Parienti Satisfies the "Built Into" Limitation

In an attempt to satisfy the "built into" limitation the Petitioners argued that Parienti discloses a housing that is not detachable from the mattress. Petitioners also argued that the housing is "integrated" into the mattress because pipe 9, which is located in the mattress, is somehow part of Parienti's housing. *See* Appx000371-000372.

The Board analyzed both Petitioner's argument initially presented in its Petition and the improper argument raised in the Reply. Regarding the Petition arguments, the Board concluded that "we determine, based on the otherwise complete record, the Petitioner has not demonstrated by a preponderance of the evidence that claim 1 would have been obvious based on Parienti and Renz." Appx000377. Regarding the improper reply argument, the Board was "persuaded by Patent Owner's argument that the fact that a structure is 'made interdependent with the mattress by means of gluing or any other means' (Ex. 1308, 1:24–25) does not by itself lead to the conclusion that the structure is 'built into' mattress 5 in Parienti as we have defined this term; instead, that fact only addresses one part of the construction of 'built into'- i.e., whether the structure is 'detachable from' mattress 5 in Parienti." Appx000382.

The Board correctly notes that "Petitioner focuses on 'integrate' (Pet. Reply 3), but the phrase at issue from our construction (and that of the Texas District Court) is 'integrated ***into***.'" And, "[t]hat phrase, in turn, reflects the claim language 'built into'" with "[t]he understanding that 'built into' requires at least some level of recess of the 'housing' into the 'inflatable body' is also supported by the Specification, which, for example, describes pump assembly 43 in Figure 4A as 'built into the mattress pad 41.'" Appx000383, emphasis added.

The Board concluded that "even if the [improper] arguments in the Reply as to the 'integrated into' aspect of the 'built into' limitation (Pet. Reply 3–4) are considered, Petitioner has not shown by a preponderance of the evidence that Parienti satisfies the 'built into' limitation" Appx000383-000384.

### 3. The Board Did Not Diverge from the Agreed Construction for "Built Into" in the IPR2018-00873 Final Written Decision for the Improper Reply Argument

Appellant contends that the Board "effectively adopted a new construction of this ["Built Into"] term" where the "Board imposed an additional limitation, explaining that 'built into' requires '***at least some*** level of recess of the 'housing' ***into*** the 'inflatable body' – which the Board referred to as 'the at-least-partial recess requirement.'" App. Opening Brief at 21, emphasis in original. As previously stated, the Board recognized that "the parties agree on the construction of 'built into,' but

do not agree on the application of that construction to the asserted prior art." Appx000358.

The Board did not agree with the Patent Owner's interpretation of the term "integrated into" to mean that "the housing itself *forms a part of the inflatable body and is designed to hold air* within the chamber like the other portions of the chamber wall which do not include the housing." Appx00383, emphasis in original. Rather, the Board responded that the term "'integrated into' requires *at least some* level of recess of the 'housing' *into* the 'inflatable body.'" Appx00383. Appellant argues that the Board's interpretation of the "integrated into" portion of the construction of the "built into" term is in conflict with the "procedural requirements of the Administrative Procedure Act ("APA")." App. Opening Brief at 23. Appellant cites to *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1328 (Fed. Cir. 2019) stating that "this Court has 'faulted the Board for announcing a claim construction that '***varie[d] significantly***' from the uncontested construction announced in the institution decision." *Id.*, emphasis added.

But the Court, in *Arthrex,* explained that to qualify as an APA issue the Board's decision must be so divorced from the arguments presented by the petitioner as to ***impair*** appellate review. The Court further clarified that this would include where the Board's decision does not allow the determination of how the Board reached the conclusion that the challenged claims would have been obvious or

whether the Board's actions complied with the APA's procedural requirements. *See Arthrex, Inc.*, 935 F.3d 1319, 1328.

In *Arthrex,* the Court held that the Board clearly identified the portion of the references it relied on, explained the evidence and arguments, and agreed with the Board's findings. *Id.* The Court in *Arthrex* further found the Board's decision was sufficient where it "clearly articulated [party's] arguments," "engaged in reasoned decision making," and "sufficiently articulated its analysis in its opinion to permit our review." *Arthrex, Inc.*, 935 F.3d 1319, 1328. The Court ultimately rejected "Arthrex's assertion that the Board violated its procedural rights." *Id.*

Here. as in *Arthrex*, the Board clearly articulated the arguments of both the Patent Owner and the Petitioner and articulated its analysis. The Court's refinement of the meaning of the "integrated into" portion of the term "built into" clearly identified the references relied upon, explained the evidence and arguments, and thus is in line with the ultimate decision in *Arthrex*. Accordingly, the Board did not violate Appellant's procedural rights.

#### 4. The Board Correctly Found Petitioners Failed to Show Pipe 9 is Part of Parienti's Housing

As discussed above, the Board stated that "Petitioner argues that Parienti satisfies the 'built into' limitation because (1) the identified 'housing is not detachable from mattress 5' … and because (2) the identified 'housing is integrated into mattress 5' in that 'pipe 9 is part of [Parienti's] pump housing and pipe 9 extends

into mattress 5.'" Appx000371-000372. Petitioners argued that TWW's own expert, Dr. Stevick, admitted that pipe 9 was part of the housing. But the Board disagreed, referencing Dr. Stevick's declaration as stating the exact opposite: "[Dr. Stevick] stated that pipe 9 is ***not*** part of the alleged housing." Appx000378, emphasis in original. The Board also correctly noted that Petitioners' expert declaration referencing that pipe 9 is part of the Parienti housing provides no basis for such a conclusion. The Board states that Dr. Beaman simply assumes, without support, that pipe 9 is part of Parienti's housing.

The Board also correctly noted that although Dr. Stevick testified that "at most, only pipe 9 and not the pump is built in the chamber wall," that such a statement from Dr. Stevick does not address whether pipe 9 is part of a 'housing' in the first place." *See* Appx000378-000379.

The Board further questioned Petitioners' unsupported logic regarding the inclusion of pipe 9 in Parienti's housing. For example, the Board questioned the Petitioners' logic that a POSA would have included pipe 9 in Parienti's housing, but somehow excluded other attached structures such as "pipe 16" from Parienti's housing. *See* Appx000379-000380. The Board also questioned Dr. Beaman's lack of explanation for his conclusion that "there can be no reasonable dispute that pipe 9 is part of Parienti's housing." Appx000379-000380.

Thus, the Board correctly concluded that "Petitioner has not demonstrated by a preponderance of the evidence that claim 1 would have been obvious based on Parienti and Renz." Appx000384. And, "[g]iven the similarity of the parties' positions and arguments as to the 'built into' limitation in the context of the asserted ground of Parienti and Wu and the prior asserted ground of Parienti and Renz, for the same reasons discussed above …, Petitioner has not shown by a preponderance of the evidence that Parienti satisfies the 'built into' limitation" and "[t]hus, we determine, based on the complete record, that Petitioner has not demonstrated by a preponderance of the evidence that claim 1 would have been obvious based on Parienti and Wu." Appx000392-000393.

## VII. ARGUMENT – CROSS APPEALS

### A. Standard of Review

This Court reviews "de novo the Board's ultimate claim constructions and any supporting determinations based on intrinsic evidence." *Personalized Media Communs., LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020). Here, the Board applied incorrect claim constructions and misinterpreted certain references to reach its conclusion that the prior art references rendered obvious the challenged patent claims.

This Court reviews "the Board's ultimate obviousness determination de novo and underlying factual findings for substantial evidence." *ClassCo, Inc. v. Apple,*

*Inc*., 838 F.3d 1214, 1218 (Fed. Cir. 2016) (citation omitted). The question of whether there existed a motivation to combine prior art references "is an issue of fact, [reviewed] for substantial-evidence support." *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1363 (Fed. Cir. 2018) (quoting *Skky, Inc. v. MindGeek,* s.a.r.l., 859 F.3d 1014, 1021 (Fed. Cir. 2017)).

### B. The Board Erred Regarding Chaffee, Wu, and Goldsmith

The Chaffee, Wu, and Goldsmith references are used in IPR2018-00870, IPR2018-00871, and IPR2018-00874 where at least one of the references is relied upon in every ground and thus are addressed by reference, rather than repeated for each IPR ground.

#### 1. Chaffee

Because the Board's determination of obviousness for each ground involving Chaffee in Case Nos. 20-1149, 20-1150, and 20-1151 depends on Chaffee disclosing the housing is "built into" the "inflatable body," Chaffee's failure to disclose this limitation would reverse those obviousness determinations.

Claims 1 and 16 of the '394 Patent recite "a housing built into the inflatable body." The Board erred in finding that the fluid controller of Chaffee is integrated into and non-detachable from the inflatable body and, thus, "built into" as required by claims 1 and 16. As discussed above, the Board's final claim construction for the term "built into" means "integrated into and not detachable from" or as stated in

IPR2018-00872, "integrated into and not detachable (or readily removed) from." Appx000016, Appx000024, Appx000159, Appx000025, Appx000160, Appx000295, Appx000358, Appx000418.

The Board erred in identifying in Chaffee an alleged embodiment it concluded met the Board's construction of "built into." More specifically, the Board stated: "we understand Chaffee to disclose at least two different embodiments: (1) an embodiment in which flange 82 and housing 90 (as well as wall 83) are different portions of the *same* structural component and (2) an embodiment in which flange 82 and housing 90 are separate, but connected, components." Appx000038, emphasis original. In performing its review, the Board went on to conclude that embodiment "1" (above) was "built into."

As explained below, in identifying this alleged embodiment, the Board mistakenly relied on one ambiguous phrase – "[f]lange 82 may, for example, ***extend from housing 90*** or may be a separate component connected to housing 90" – to conclude that flange 82, housing 90, and wall 83 are one piece. Appx006949 at 5:7-9. But this conclusion is contrary to the disclosure in Chaffee, which can be seen upon review of certain amendments that were made to the figures in Chaffee during prosecution.

a) The Housing in Chaffee is Not "Built into" as the Connection to the Inflatable Body is Reversible

With regard to the above first embodiment described by the Board, the Board in effect stated that the green and orange portions shown in FIG. 5 below could be one piece. But there is no disclosure in Chaffee that these components could be one piece. In addition, as discussed below, the only embodiments in Chaffee describe reversible connections which are not "built into."

FIG. 5 of Chaffee shows the pump housing 90, highlighted in orange, which contains the pump components (Appx000741). FIG. 5 also shows wall 83 and flange 82, both highlighted in green:




Fig. 5

Appx000742.

Chaffee explains that the reason why the pump housing 90 and flange 82 are separate pieces and utilize a reversible connection is to allow "the removal of portions of fluid controller 80 for repair or replacement, preventing the entire inflatable device from having to be disposed of in the event of a failure of one component." Appx000745, citing Appx006949 Chaffee at 5:44-48. Also, as discussed by Dr. Stevick, Chaffee states that a goal of the patent is to ensure that the pump is accessible and removable, with the idea that it can be fixed or replaced without destroying the airbed. Appx014994. Thus, there could not be any permanent connection between the pump housing 90 and flange 82.

The intrinsic evidence of Chaffee demonstrates that FIG. 5 does not disclose a one-piece housing as FIG. 5 uses hatching to show the pump housing 90 is a different element than the fluid impermeable wall 83 or flange 82. Appx001034. FIG. 5 is consistent with patent drafting rules which employ different angles of hatching for ***different elements***. See 37 C.F.R. 1.83(h)(3)(" … The hatching of juxtaposed different elements must be angled in a different way.")(emphasis added.) *Id.*

As discussed by TWW's expert, Dr. Stevick, in his declaration:

> The intrinsic evidence also demonstrates that FIG. 5 is not a one-piece housing. FIG. 5 is a cross-sectional drawing which uses hatching to show the housing 90 is a different element than the fluid impermeable wall 83 of flange 82. FIG. 5 is consistent with patent drafting rules which employ different angles of hatching for different elements. See 37 C.F.R. 1.83(h)(3)(" … The hatching of juxtaposed

***different elements*** must be angled in a different way.")(emphasis added.) In the following colorized excerpt of FIG. 5, the arrows to the walls of fluid impermeable wall 83 (orange) and housing 90 (blue) show hatching at different angles indicating that the flange and housing are different elements.
Appx014867 (Stevick Decl. at ¶91.)




Chaffee, FIG. 5 excerpted and annotated. Appx014868.

The Board's argument that Chaffee discloses a one-piece housing seems to rely in part on Petitioners statement that Chaffee discloses this one-piece structure as connected to bladder 20 by "adhesive or heat seal." Appx000035. But Chaffee actually states "[f]or example, bladder 20 may be adhered or sealed **to a portion of** fluid controller 80**,** such as with an adhesive or heat seal." Appx006948-006949 at

4:67-5:2, emphasis added. Thus, this language provides only an example of a connection between bladder 20 and **a portion of** fluid controller 80. In any such embodiment the reminder of fluid controller 80 would still be removable.

b) The Use of "Extend From" in Chaffee Does Not Equate to "Built into"

The Board concluded, mistakenly, that Chaffee disclosed a non-reversible connection between pump housing 90 and flange 82 by (mis)interpreting a single four word phrase in the specification which states "[f]lange 82 may, for example, ***extend from housing 90*** or may be a separate component connected to housing 90." Appx006949 at 5:7-9, emphasis added. The Board erred in interpreting this phrase as allegedly disclosing an alternative in Chaffee that the flange 82 had a non-reversible connection with pump housing 90. There is no figure in Chaffee or any other disclosure that supports such an interpretation. Indeed, this interpretation is contrary to the figures which illustrate pump housing 90 and flange 82. *See* annotated FIGs. 3 and 5 below (flange 82 and pump housing 90 shown in red). No figure in Chaffee shows a non-reversible connection – or any connection – *between* flange 82 (the peripheral lip portion of the green element) and pump housing 90.




Fig. 3




Fig. 5

Appx006942 Appx006944

In its analysis, the Board stated that "[w]e agree with Patent Owner that merely stating that flange 82 'extend[s] from' housing 90 does not, *by itself*, indicate whether the flange and pump housing are part of the same structural component or whether they are separate, but connected." Appx000038. Thus, the Board recognized that the words themselves do not disclose a single structure and that other support for the Board's conclusion is required. But the Board did not identify any other such support.

In erring in its analysis, the Board relied on its interpretation of the phrase "extend from." The word "extend" **does not** dictate that two separate components are combined as one. Rather, "extend" refers to a direction such as my property

**extends from** Main street to Green street. Such a use of extend does not connote a non-reversible connection, as the Board stated, but rather a direction of flange 82 in relation to housing 90. Further, as shown above in FIG. 5 of Chaffee and as stated by Dr. Stevick, flange 82 and housing 90 are ***separate*** components, "FIG. 5 is a cross-sectional drawing which uses hatching to show the housing 90 is a different element than the fluid impermeable wall 83 of flange 82. FIG. 5 is consistent with patent drafting rules which employ different angles of hatching for **different elements.**" Appx014867, emphasis in original.

Even if the Board correctly interpreted the phrase "[f]lange 82 may, for example, *extend from* housing 90 …," this phrase does not mean the connection between fluid controller 80 and bladder 20 is non-reversible. Appx006949 at 5:7-9. The Board stated that the two options expressly disclosed in Chaffee for connecting fluid controller 80 and bladder 20 only described reversible connections where flange 82 is a separate component from pump housing 90. But, based solely on the phrase "[f]lange 82 may, for example, *extend from* housing 90 ….," the Board concluded that a non-reversible connection between fluid controller 80 and bladder 20 is disclosed in Chaffee. However, the Board fails to explain what the alleged non-reversible connections are in Chaffee. Chaffee only discloses two options for connecting fluid controller 80 to bladder 20: a first option in which portions of fluid controller 80 can disconnect from bladder 20 and a second option in which the entire

fluid controller 80 (including flange 82 and housing 90) can disconnect from bladder 20. Appx000040. No options for a non-reversible connection between fluid controller 80 and bladder 20 are disclosed in Chaffee and the Board fails to explain its conclusion that such a non-reversible connection exist.

#### c) Chaffee's Original Disclosure Did Not Disclose a Built in Pump Housing; Later Changes to the Chaffee Application Came After the '394 Priority Date and Are Not Prior Art

The Board erred by ignoring that the original disclosure in Chaffee shows the "extend from" phrase of Chaffee does not teach a one-piece flange and motor housing. Chaffee's original disclosure explains the meaning of the phrase "[f]lange 82 may, for example, extend from housing 90," through the use of original FIGs. 3 and 4, which labelled what is now exterior wall 83 as housing 90. Consequently, Chaffee's original disclosure showed flange 82 extending from exterior wall 83. At a minimum, Chaffee's original disclosure shows that the disclosure of Chaffee is ambiguous and not proper for use as an obviating reference.

Chaffee's original disclosure was amended to change the numbering of certain figures – which explains the meaning of the "extend from" phrase – years after the priority application for the '394 Patent was filed.




Original FIGS. 3 and 4 (in the left-hand column below) show the reference character “90” (labeled with a red box) pointing to the rear wall of a first housing structure (green) including flange 82 (also labeled with a red box). The original FIG. 5 (in the left-hand column below) shows the housing as both “90” and “80” and shows flange 82 (all labeled with a red box). These ambiguities are, in part, why the Examiner objected to the figures in the Chaffee original application, and why the Applicant amended the figures in 2005.

But the issued FIGs 3 and 4 (in the right-hand column below) do not show a label 90 at all. Issued FIG. 5 only shows the housing (outlined in orange) as “90” and shows the structure outlined in green as fluid impermeable wall 83. Issued FIG. 5 also shows flange 82 (labeled with a red box). As explained below, the changes to the numbering associated with Chaffee’s figures explain that the “extend from” phrase does not indicate a design in Chaffee where flange 82 and housing 90 are one piece.

**<u>Orginal Application Figures</u>**




Appx016295.

**<u>Chaffee Figures as Issued</u>**




*Fig. 3*

Appx006942.




Appx016296.




*Fig. 4*

Appx006943.







Fig. 5

Appx006944.

Appx016297.

The Examiner during prosecution of the Chaffee application found the disclosure so confusing it prompted an objection to the drawings, resulting in a substantive amendment of the figures of Chaffee (as shown above), made years after the effective filing date of the ’394 Patent. *See* Appx011052. In 2005, the reference to elements “90” were deleted after the publication of the application and before the issuance of Chaffee. *See* Appx000043, Appx000177-000178, Appx000438-000439, Appx001030-001032, Appx002162-002164, Appx005142-005144, Appx010236-010238, Appx010711-010713, Appx011055-011057, Appx013002-013004, Appx014863-014865, Appx017895-017897, Appx018829-018831. Thus, at the

time the ’394 Patent application was filed, the original figures shown above were the only figures in existence for Chaffee.

Chaffee’s original disclosure clearly shows that the “extend from” phrase of Chaffee (Appx006949 at 5:7-9) is a direct reference to flange 82 extending from what is now exterior wall 83, then labelled as the green “housing 90” structure of original FIGs. 3 and 4 as filed and published. These original figures 3 and 4 explain what is meant by the specification stating “[f]lange 82 may, for example, extend from housing 90” - meaning that flange 82 may be formed as a peripheral lip on wall 83.

The Board erred in interpreting the language in the specification – “[f]lange 82 may, for example, extend from housing 90” – based on the *issued* figures 3 and 4, which were only corrected years after the priority date of the ’394 Patent. As seen in the issued figure 5 above, flange 82 “extends from” wall 83 – **<u>which was “90” in the original figures 3 and 4</u>**. *See* Supra. The language in the specification read in light of the originally filed figures show that flange 82 in no way connects to housing 90. Thus, Chaffee does not teach that a flange 82 extends from housing 90. Appx001034, Appx002166, Appx005146, Appx010240, Appx010715, Appx011059, Appx013006, Appx014867, Appx017899, Appx018833.[11]

[11] In its Final Written Decision, the Board focused on whether the changes made during prosecution were new matter added improperly to Chaffee. Appx000048,

Chaffee was the only reference relied upon by the Board for prior art showing a pump housing purportedly built into an inflatable body, so once the Board's error on this point is corrected, the Court should reverse the Board's finding that any of the combinations that include Chaffee would render obvious any of the '394 patent claims, since none of those combinations would meet all patent claim limitations.

### 2. Wu and Goldsmith fail to disclose an "Inflatable Body"

The Board concluded that Wu disclosed the "inflatable body" limitation of the '394 Patent because it met the Board's construction of "a structure that expands when filled with air or other gases." For Goldsmith, the Board concluded that Goldsmith disclosed the "housing built into the inflatable body" limitation of the '394 Patent because it met the Board's construction of "inflatable body" as "a structure that expands when filled with air or other gases."

The Board erred by construing the term "inflatable body" as not requiring that the "inflatable body" be "substantially airtight" as construed by the District Court. In an *inter partes* review proceeding, the claims are given their broadest reasonable interpretation in light of the specification. 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). However, when giving claims their broadest reasonable

---

Appx000182-000183, Appx000443-000444. The issue here is not whether new matter was added but how to properly interpret the disclosure of Chaffee as shown in the original figures.

interpretation, the Board cannot construe the claims so broadly that its constructions are unreasonable under general claim construction principles. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (overruled on other grounds *Aqua Prods. V. Matal*, 872 F.3d 1290 n. 1 (Fed. Cir, 2017)). "[T]he protocol of giving claims their broadest reasonable interpretation … does not include giving claims a legally incorrect interpretation" *Id*. The broadest reasonable interpretation cannot be "divorced from the specification and the record evidence." *Id*. *See also D'Agostino v. MasterCard Int'l, Inc.*, 844 F.3d 945, 948 (Fed. Cir. 2016) (citations and internal quotation marks omitted). *See* Appx000712-000713.

The term "inflatable body" is used in all of the independent claims of the '394 Patent and therefore is present in each of the Challenged Claims. The Board construed "inflatable body" to mean a "structure that expands when filled with air or other gases." However, a device that receives air but does not retain it is not the same as an inflatable object such as an air mattress which must retain air in order to perform its function. By not including the "substantially airtight" requirement the Board violated basic claim construction rules (*see In re Translogic Tech., supra*) because the Board's construction would be at odds with the '394 specification in which every air mattress embodiment is an inflatable body that retains air. (*See*, *e.g*., Appx000548, Appx000555, Appx000564, appx000568, Appx000582-000583, '394 Patent at FIGS. 1A, 4A, 5A, 7A and 3:15–45, 4:39–62, 5:48–64, and 6:10–16.)

Construing "inflatable body" to include a "substantially airtight" requirement is also consistent with how Patent Owner defined that term before the Patent Office. For example, during prosecution of the '018 Patent[12] in a response to an Office action dated November 20, 2006, Applicant stated:

> Although the term 'inflatable body' is not expressly defined in the specification, it is clearly used in its ordinary and customary sense, *i.e.*, ***a body that is substantially airtight and expands when filled with air or other gas***. … The embodiments in the specification are airbeds, and these are without question the characteristics of airbeds. This definition is also wholly consistent with and supported by the way in which the term 'inflatable' is defined in the *American Heritage Dictionary of the English Language, 4th Edition*, namely, '[d]esigned to be filled with air or gas before use: ***an inflatable mattress***.'
> Appx000716

Further, two district courts in two separate cases involving at least the Appellant and Patent Owner have construed "inflatable body" as including the "substantially airtight" requirement. In one case, the district court adopted such a

[12] While Applicant's statements regarding "inflatable body" were made during prosecution of the '018 Patent rather than the '394, the two patents include an identical Field of Invention, use many of the same terms (including "inflatable body" in the claims) and cover similar subject matter. (U.S. Patent No. 9,211,018, Appx014680-014710 and the '394 Patent, Appx000546-000585.)

construction after rejecting the same arguments[13] made by the Appellant. Appx007694-007699. In a second earlier case, the U.S. District Court for the District of Columbia also adopted the "substantially airtight" construction for U.S. Patent No. 6,793,469 which has the same specification as the '018 Patent. Appx014664-014665. Both district courts construed "inflatable body" as "substantially airtight structure that expands when filled with air or other gases." Consistent with the district court constructions, "inflatable body" should be construed as "a substantially airtight structure that expands when filled with air or other gases."

Because the Board's determination of obviousness for each ground involving Wu and Goldsmith in Case Nos. 20-1149 and 20-1151 depends on the Board's failure to include the requirement of "substantially airtight" in the construction of inflatable body," the inclusion of this requirements in the construction of "inflatable body" would reverse those obviousness determinations.

#### a) Wu fails to disclose a the "Inflatable Body" Requirement of the '394 Patent

The Board concluded that Wu disclosed the "inflatable body" limitation of the '394 Patent because it met the Board's construction of "a structure that expands

[13] Appellant argued that because the "inflatable body of the '394 Patent must always include a hole or opening that communicates with the pump structure, the "inflatable body" cannot be substantially airtight. Appellant also argued that that district court relied on the prosecution history of TWW's '018 Patent instead of the '394 Patent.

when filled with air or other gases." The Board erred because it did not include the "substantially airtight" requirement that was part of earlier claim constructions. The air mattress 400 of Wu is clearly not "substantially airtight" since it "has a large number of small holes in its upper surfaces to permit air to constantly circulate around a supported patient." Appx000739, Appx006933 at 2:59–62. Wu discloses a variable speed blower for providing continuous air flow to Wu's mattress 400, which can vary the air flow to support for example "a pulsating mattress or constant pressure mattress." Appx007684, Appx007685. Wu's mattress 400 with all of its chambers and complex control system 10 teaches providing a continuous air flow mattress without being substantially airtight. *See* Appx000739-000740.

b) Because Goldsmith Lacks an "Inflatable Body," Goldsmith fails to disclose a "Housing Built Into the Inflatable Body"

The Board concluded that Goldsmith disclosed the "housing built into the inflatable body" limitation of the '394 Patent because it met the Board's construction of "inflatable body" as "a structure that expands when filled with air or other gases." The Board erred because Goldsmith discloses a traditional "inner spring mattress" Appx006953 at 1:1-3. As known to one or ordinary skill in the art, a traditional "inner spring mattress" is not directed to an "inflatable" air mattress, nor is Goldsmith directed to inflatables.

The entire purpose of Goldsmith is to blow air out of the conventional mattress, not to inflate it. Appx001055. "Air will be blown and heated … and distributed into and through the said air compartment 17 and out through the outlet ports 19 and through the pores of the fibrous glass material 18." *Id.* This is shown with blue arrows in FIG. 2 (color added to existing arrows):




Appx001055 (annotated).

In the IPR2018-00870 and IPR2018-00871 Final Written Decisions, the Board discussed the construction of the term "inflatable body." *See* Appx000151-000159. In those Decisions, the Board stated":

> "by way of analogy, ***a customary party balloon*** (with a large hole for inflation) but would not alone be substantially airtight under Patent Owner's understanding. See Tr. 11:19–12:2 (counsel for Petitioners discussing this analogy when addressing their proposed construction for 'inflatable body'). Adding another component to the party balloon to close the hole, however, could result in an overall structure that is substantially airtight."

Appx000156, emphasis added.

Thus, the Board understood that an "inflatable body" must be able to expand from its original size and shape when inflated. But the mattress in Goldsmith does not expand as it is designed to blow air out of a conventional inner spring mattress and not to inflate.

Appellant's expert, Dr. Beaman, concludes that "Goldsmith's mattress would necessarily and naturally expand, as the internal pressure would build up around the ports 19 in the upper mattress layer." Appx005656-005657 at ¶134. Dr. Beaman gives no supporting facts or data for his opinion that the mattress would expand, and as such his testimony should be given little or no weight. *See* Appx001055. Dr. Beaman also admits that "Goldsmith teaches a traditional mattress." Appx005656. Accordingly, the Board erred in determining that Goldsmith discloses an inflatable body.

### C. Secondary Considerations of Evidence of Commercial Success Support Nonobviousness

The Board concluded that TWW's evidence of secondary considerations weighed only slightly in favor of nonobviousness. Specifically, the Board determined that "there is at least some nexus," but stated "the nexus between these sales and the claimed product features, however, is weak." Appx000081, Appx000084, Appx000210, Appx000478-000479.

The Board erred by ignoring significant evidence of commercial success of airbeds practicing the ’394 Patent for all grounds in Case Nos. 20-1149, 20-1150, and 20-1151. The Board also failed to properly consider the extensive evidence presented by TWW’s experts showing that the commercial success of products practicing the patented inventions.

“For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.” *In re GPAC Inc*., 57 F.3d 1573, 1580 (Fed. Cir. 1995). A nexus must be demonstrated for all types of objective evidence of nonobviousness. *See id*. (addressing nexus generally); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013) (addressing long-felt need); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (addressing copying); *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011) (addressing unexpected results); *Muniauction, Inc. v. Thomson Corp*., 532 F.3d 1318, 1328 (Fed. Cir. 2008) (addressing praise); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (addressing commercial success). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See GPAC Inc*., 57 F.3d at 1580 (“To the extent that the patentee demonstrates the required nexus, his objective evidence of nonobviousness will be accorded more or less weight.”); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc*., 776 F.2d 281,

306 (Fed. Cir. 1985). Conversely, the stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. Appx000075.

"[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016) (internal citation omitted); *see* also *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 747 (Fed. Cir. 2016) ("Because the evidence shows that the SignalTight connectors are 'the invention disclosed and claimed in the patent,' we presume that any commercial success of these products is due to the patented invention … . This is true even when the product has additional, unclaimed features.") (internal citations omitted). Appx000075-000076.

TWW presented extensive evidence demonstrating the nexus between airbed products and the claimed inventions. Dr. Stevick specifically addressed that the TWW airbed models practice at least claims 1-3, 7- 12, 16-18, 22 and 23 of the '394 Patent. Appx014916, *see also* Appx014916-014940 at ¶¶179-224.

The Board acknowledges that TWW competitors, including the Petitioners, admit infringing the '394 patent, "[a]s to the admission of infringement by certain competitors in the Texas Litigation, products from Airtek, Air Cloud, Air Comfort, AirBedz, Altimair, Pittman, and TexSport admittedly infringe claims 1–5, 7–12, 16–

20, 22, and 23 (i.e., most, but not all, of the Challenged Claims) of the '394 patent … Products from Intex, Bestway, and Boyd admittedly infringe claims 1-5, 7, 8, 10, and 12 of the '394 Patent." Appx000077, Appx000203, Appx000472. These admissions alone provide objective evidence "tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC,* 829 F.3d at 1329; *see also PPC Broadband, Inc,* 815 F.3d at 747.

The Board even acknowledged that TWW had demonstrated commercial success of the '394 Patent claimed inventions. Specifically, the Board stated that "we recognize that Patent Owner shows the commercial success of certain airbeds that fall within the scope of some of the Challenged Claims based on the large revenues (approximately [redacted] generated by sales of these certain airbeds." Appx000084, Appx000210. In IPR2018-00874 the Board also stated that "Patent Owner shows commercial success of certain airbeds that fall within the scope of some of the Challenged Claims based on the revenues generated by sales of these airbeds." Appx000478.

However, after finding a nexus between the claimed '394 Patent features and commercial success, the Board erred in concluding that "the nexus between these sales and the claimed product features, however, is weak." Appx000084, Appx000210, Appx000479. The evidence of record makes clear that "sales of the patented products by [redacted] alone have exceeded [redacted]" Appx000082,

Appx000207, Appx000476, Appx001070, Appx002203, Appx003136, Appx004104, Appx005185, Appx007926, Appx007955, Appx010008, Appx010754.

TWW demonstrated the strong commercial success of inflatable airbed products practicing the '394 Patent. Such strong indicia of commercial success shows that the inventions of the '394 Patent are not obvious.

For example, as stated by Dr. Stevick, "Intex offers different airbed designs that are comparable except for the patented inflate/deflate built-in electric design" and "[t]hus, it is possible to isolate the design of the patent claims to determine if they have independent value and therefore nexus to secondary considerations such as commercial success and others." Dr. Stevick concluded that "[t]hey do." Appx010125, Appx010306-010307, Appx011108, Appx013082, Appx014027-014028, Appx014942-014943, Appx017965-017966, Appx018288-018289, Appx018604-018605, Appx018907-018908.

Dr. Stevick also noted that multiple commercial buyers testified that "[c]onsumers are willing to pay more for airbeds with the patented inflate/deflate built-in electric pump design," citing Finance Info and Finance Info buyers. *Id*. The Board erred in not according sufficient weight regarding commercial success as "the Board misunderstood and, thus, gave insufficient weight to PPC's evidence of commercial success. PPC presented evidence that customers chose to purchase its more

expensive, patented SignalTight connectors than its unpatented EX connectors." *PPC Broadband, Inc. v. Iancu*, 739 F. App'x 615, 626 (Fed. Cir. 2018).

Regarding commercial success, Dr. Stevick also noted that "well after the '394 patent priority date, Intex introduced its version of the '394 patented design with the built-in pump, and it stopped offering the external strapped pump design … and instead used a design where the pump unit is built into the external wall of the airbed and still has a unidirectional fan with a moveable air conduit that reverses the flow of air through the pump unit and air conduit between the first inflate position and the second deflate position in accordance with the claim so the '394 patent." Appx010311.

Dr. Stevick noted that "[c]ommunications between [redacted] and Intex also confirm the commercial success of these product due to the '394 patented inventions" where it was noted that "'indoor' (TWW patented inflate/deflate built-in pump design) beds are the vast majority of the total demand by consumers, making up [redacted] of Intex sales to [redacted] by dollars, and ranging from [redacted] to [redacted] of Intex's sales to its top 6 customers." Appx010316-010317, Appx11117 Appx014038-014039 Appx014952-014953, Appx017975-017976, Appx018298-018299, Appx018615, Appx018918. Dr. Stevick concluded that "[g]iven the amount of sales at issue, the accused products which infringe the Asserted TWW Patents have all achieved commercial success as have TWW's products which practice various

Asserted TWW Patent Claims." Appx010317, Appx11117, Appx014039, Appx014953, Appx017976, Appx018299, Appx018615-018616, Appx018918.

Dr. Stevick concluded that "[m]y review of the products offered and how they are advertised in comparison to the TWW Patent claims leads me to the conclusion that the commercial success of those products is due to the inventions of the TWW Patents" and that "[a]ll of the electric built-in pump airbed models I have analyzed in this case, including those by TWW and others sold by [redacted] practice the TWW Patent claims as described in my expert report on infringement, so the fact that these in particular were commercially successful is tied to the patented technology." Appx010317, Appx011117-011118, Appx014039, Appx014953, Appx017976, Appx018299, Appx018616, Appx018918-018919.

**D. The Board Erred Regarding Obviousness Combinations**

Because the Board's determination of obviousness for each ground involved in Case Nos. 20-1149, 20-1150, and 20-1151 involving the combinations listed below also depends on a determination of a POSA's motivation to combine, a finding that the motivation does not exist would reverse those obviousness determinations. In addition, even if the Court found a motivation to combine, the combinations listed below do not disclose the limitations of the claims of the '394 Patent.

**1. Wu and Chaffee**

a) Motivation to Combine

The Board concluded that a POSA would have been motivated to combine Wu and Chaffee because a POSA allegedly would have understood that using a housing like Chaffee would improve spatial efficiency and that housing Wu's pump components in Chaffee's housing would improve durability of the inflatable mattress. Appx000074.The Board also stated that a POSA would recognize that the built-in pump design of Chaffee was allegedly more time and labor-efficient as it enhanced user convenience. *Id*.

The Board erred in concluding that a POSA would have been motivated to modify Wu based on Chafee for several reasons. First, a POSA would avoid building Wu's motor and pump into the side of a bed given at least the issue of heat generated by the motor and pump ("Another object of the present invention is to provide an air mattress air supply and control system having a fan and motor that will not over heat as is now the case with many existing systems") (Appx006933 at 1:36-39). *See* Appx001306, Appx008141. While "Petitioners allege numerous prior art designs – including continuously operating designs – which they allege demonstrate no heating issue," they fail to cite the use of "such continuously operating design [that] was built into an inflatable body." Appx001306. Further, "Petitioners never refute that a key way to avoid heating issues when building in a pump is to avoid constantly

running pump designs such as Wu.” Appx001306-001307, emphasis added, Appx001023-001025. Second, Wu discloses a flowing air system and Chaffee does not, and such an incompatibility of the systems would be apparent to a person of ordinary skill in the art. Appx001307. Accordingly, the combination of Wu and Chaffee is contrary to the teaching and objectives of Wu and those of the ’394 Patent.

##### b) Combination Fails to Render the Claims of the ’394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Wu and Chaffee, this combination fails to disclose the limitations of the claims of the ’394 Patent. As discussed in Section VI.B.1, Chaffee does not disclose the “built into” limitation and, as discussed in Section VI.B.3, Wu does not disclose an “inflatable body.”

#### 2. Wu and Goldsmith

##### a) Motivation to Combine

Similar to the Wu and Chaffee combinations, the Board concluded that a POSA would have been motivated to combine Wu and Goldsmith because a POSA allegedly would have understood that using the built-in housing teachings of Goldsmith to incorporate the pump components of Wu would improve spatial efficiency and that housing Wu’s pump components in Goldsmith’s housing would improve durability of the inflatable mattress. Appx000074.

The Board erred because "Goldsmith discloses a much different device than Chaffee …." Appx001058. Moreover, Goldsmith is not analogous art because, as the Board concluded, Goldsmith is directed to a conventional inner spring mattress with holes in it and a blower to circulate air through the holes for heating or cooling. Such a device is not "reasonably pertinent" to the problem the '394 Patent inventor was trying to solve as it had no relation to inflating and deflating an air mattress with a built-in pump. *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). Accordingly, the combination of Wu and Goldsmith is contrary to the teaching and objectives of Wu and those of the '394 Patent.

b) Combination Fails to Render the Claims of the '394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Wu and Goldsmith, this combination fails to disclose the limitations of the claims of the '394 Patent. As discussed in Section VI.B.3, Goldsmith does not disclose the "built into" limitation because it is not an "inflatable body" and, as discussed in Section VI.B.3, Wu does not disclose an "inflatable body."

**3. Walker and Chaffee**

a) Motivation to Combine

The Board concluded that a POSA would have been motivated to combine Walker and Chaffee because a POSA allegedly would have understood that building Walker's casing into an air mattress like Chaffee would improve spatial efficiency

and that modifying Walker's casing like Chaffee would improve durability of the inflatable mattress. Appx000074. The Board also stated that a POSA would recognize that the built in pump design of Chaffee was allegedly more time and labor-efficient as it enhanced user convenience. *Id*.

The Board erred in concluding that a POSA would have been motivated to modify Walker based on Chafee, as proposed, for at least the purposes of improved spatial efficiency and improved durability. Appx000199. Appellant's expert, "Dr. Beaman admitted that attempting to integrate the Walker pump into an air mattress presents many design challenges that are solved by leaving the pump housing external." Appx002438, Appx020324-020331.

"A mattress in a sleeper sofa folds to store within the confines of the sofa when not in use." Appx002156-002157. "A POSA would know that any additional parts, like a pump and housing, that could impede folding the bed or damage it when folding or unfolding are undesirable, and would be avoided." Appx002157, Appx017889 at ¶63. Further, placing Walker's air pump in the mattress of a sofa sleeper would not be more convenient as Walker's sofa already addresses the concept of conveniently inflating or deflating the air mattress by us of a hand control 327 on the sidearm 312. *See* Appx002157, Appx006992 at 11:32-47. Further, as the Walker pump is part of a large, permanent sofa structure with plenty of room for storage outside the air mattress, building the pump into the mattress of the bed is

unnecessary. Appx002157. Dr. Beaman also testified that a pump could be attached to a shelf or something built into the base of a sofa bed, without having to put it into the air mattress, and that moving such a design would have the pump move with it. Appx002157, Appx015602-015603 at 250:18-251:17, Appx015492 at 140:6-16. Accordingly, the combination of Walker and Chaffee is contrary to the teaching and objectives of Walker and those of the ’394 Patent.

a) Combination Fails to Render the Claims of the ’394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Walker and Chaffee, this combination fails to disclose the limitations of the claims of the ’394 Patent. As discussed in Section VI.B.1, Chaffee does not disclose the “built into” limitation.

**4. Walker and Goldsmith**

a) Motivation to Combine

Similar to the Walker and Chaffee combinations, the Board concluded that a POSA would have been motivated to combine Walker and Goldsmith because a POSA allegedly would have understood that using the built-in housing teachings of Goldsmith to incorporate the casing of Walker would improve spatial efficiency and that modifying Walker’s casing like Chaffee would improve durability of the inflatable mattress. Appx000074.

The Board erred because "Goldsmith discloses a much different device than Chaffee …." Appx002184. Accordingly, the combination of Walker and Goldsmith is contrary to the teaching and objectives of Walker and those of the '394 Patent. Moreover, Goldsmith is not analogous art because, as the Board concluded, Goldsmith is directed to a conventional inner spring mattress with holes in it and a blower to circulate air through the holes for heating or cooling. Such a device is not "reasonably pertinent" to the problem the '394 Patent inventor was trying to solve as it had no relation to inflating and deflating an air mattress with a built in pump. *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

a) Combination Fails to Render the Claims of the '394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Walker and Goldsmith, this combination fails to disclose the limitations of the claims of the '394 Patent. As discussed in Section VI.B.3, Goldsmith does not disclose the "built into" limitation because it is not an "inflatable body."

**5. Chaffee and Wu**

a) Motivation to Combine

The Board concluded that a POSA would have been motivated to combine Chaffee and Wu because a POSA allegedly would have understood that using a housing like Chaffee would improve spatial efficiency and that housing Wu's pump components in Chaffee's housing would improve durability of the inflatable

mattress. Appx000074.The Board also stated that a POSA would recognize that the built in pump design of Chaffee was allegedly more time and labor-efficient as it enhanced user convenience. *Id*.

The Board erred in concluding that a POSA would have been motivated to modify Chaffee based on Wu for the same reasons as the discussion above for Wu and Chaffee. Appx000468. In addition to the above discussion why a POSA would not be motivated to modify Wu based on Chaffee, a "POSA would appreciate that the air system of Wu is designed for a flowing air mattress application which is substantially more complex, more expensive, and has substantially higher air flow demands than Chaffee's air mattress application." Appx005167-005168.

"Wu's blower 15 is a variable speed centrifugal fan type blower … [t]his type of blower is appropriate in a system which supplies air to a low air loss air mattress such as air mattress 400." Appx005168. So, a POSA would understand that being "appropriate in a system which supplies air to a low air loss air mattress" means that Wu uses a centrifugal fan type blower to provide ample pressure and air flow for an air mattress requiring constantly circulating air. Appx005168.

"On the other hand, a POSA would appreciate that the air mattress of Chaffee requires substantially no air flow after the mattress is inflated, and so it does not require constantly circulating air and does not experience high variations in air flow or air pressure during use." Appx005168. Thus, a POSA would not look to Wu

because it represents a more complex air system and would require at least some control to avoid overinflation and overheating if attempted to be substituted for Chaffee's reversible motor. *Id.*

Appellant also alleges that a "POSA would have had several reasons to use a Uni-directional Pump Assembly in place of Chaffee's [reversible pump].'" Appx005151. As discussed in Patent Owner's Response, a POSA would not seek to combine Chaffee with Wu for multiple reasons including that of different pump types, different pump usages, lack of spatial efficiency, lack of increased energy efficiency, lack of decreased costs, lack of decreased weight, and that any such combination is not a simple substitution. *See* Appx005151-005167. Accordingly, the combination of Chaffee and Wu is contrary to the teaching and objectives of Chaffee and Wu and those of the '394 Patent.

b) Combination Fails to Render the Claims of the '394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Chaffee and Wu, this combination fails to disclose the limitations of the claims of the '394 Patent. As discussed in Section VI.B.1, Chaffee does not disclose the "built into" limitation and, as discussed in Section VI.B.3, Wu does not disclose an "inflatable body."

### 6. Chaffee and Scott and Pisante

#### a) Motivation to Combine

The Board concluded that a POSA would have been motivated to combine Chaffee and Scott because a POSA allegedly would have been motivated to convert Chaffee's reversible pump assembly into a unidirectional pump assembly based on Scott to achieve spatial efficiency, energy efficient, cost savings, and weight reduction. Appx000516. The Board also concluded that a POSA allegedly would have been motivated to further combine Pisante (for claims 4-6, 8, 9, and 11) because a POSA would have understood that the uni-directional pump of Scott could produce the same air flow with a smaller motor.

The Board erred in concluding that a POSA would have been motivated to modify Chaffee based on Scott to change Chaffee's reversible pump design based on the uni-directional pump suggested in Scott. Appx000526. But Petitioners' expert, Dr. Beaman, stated that a "POSA would never be motivated to make such a convoluted modification/combination." Appx005175, Appx006649-006653 at ¶¶293-295 and 297-298.

Further, Petitioners argued that a POSA would be motivated to combine change the design of Chaffee based on suggestions in Scott for the same reasons a POSA would be motivated to combine Chaffee with Wu. But Scott discloses a much different device than Wu (a seat assembly vs. an air circulating mattress) and was

invented over a decade earlier. To argue that the motivations to combine these references would be the same is the epitome of hindsight reconstruction and improper. Appx0051765-005176. Accordingly, the combination of Chaffee, Scott, and Pisante is contrary to the teaching and objectives of Chaffee and Scott and those of the ’394 Patent.

The Board erred with respect to Pisante as it relied on Petitioners’ statement that “a Uni-directional Pump Assembly could produce the same amount of volume flow with a smaller, single direction motor by *optimizing the blades of the impeller for the single direction of rotation*.” Appx004805, Appx000516, emphasis added. But neither Walker, Scott, nor Pisante discusses or even mentions “optimizing blades of an impeller for the single direction of rotation.”

b) Combination Fails to Render the Claims of the ’394 Patent Obvious

Even if the Court were to find that a POSA would have been motivated to combine Chaffee and Scott, this combination fails to disclose the limitations of the claims of the ’394 Patent. As discussed in Section VI.B.1, Chaffee does not disclose the “built into” limitation.

## VIII. Conclusion

This Court should uphold the Board’s decisions as to Case Nos. 20-1141 and 20-1142 that challenged claims 1-12 and 16-23 of the ’394 Patent are not unpatentable because the asserted grounds fail to render obvious the inventive matter

of the ’394 Patent claims. As to Case Nos. 20-1149, 20-1150, and 20-1151, the Board’s determinations contained legal and/or factual errors and/or lacked sufficient supporting evidence, and, as a result, the Court should reverse the Board’s decision on those cases. In sum, the Court should rule that the U. S. Patent and Trademark Office has erred in concluding the unpatentability of challenged claims 1-12 and 16-23 of the ’394 Patent and find that these claims are not invalid.

/s/ Robert M. Harkins, Jr.
Robert M Harkins, Jr.
RUYAKCHERIAN LLP
1936 University Ave, Ste 350
Berkeley, CA 94704
(510) 944-0190
bobh@ruyakcherian.com

Timothy Bianchi
SCHWEGMAN, LUNDBERG & WOESSNER P.A.
121 South 8th St – 1600 TCF Tower
Minneapolis, MN 55402
(612) 373-6912
tbianchi@slwip.com

*Counsel for Team Worldwide Corp.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151

**Short Case Caption:** Intex Recreation Corp. v. Team Worldwide Corporation

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 15,970 words.

- ☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

- ☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 06/09/2022

Signature: /s/ Robert M. Harkins, Jr.

Name: Robert M. Harkins, Jr.

Save for Filing

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151

**Short Case Caption:** Intex Recreation Corp. v. Team Worldwide Corporation

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 10 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/09/2022

Signature: /s/ Robert M. Harkins, Jr.

Name: Robert M. Harkins, Jr.