**2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151**

# United States Court of Appeals for the Federal Circuit

INTEX RECREATION CORP.,

*Appellant,*

BESTWAY (USA), INC.,

*Appellee,*

– v. –

TEAM WORLDWIDE CORPORATION,

*Cross-Appellant,*

– v. –

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,

*Intervenor.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2018-00870, IPR2018-00871, IPR2018-00872, IPR2018-00873, IPR2018-00874 Beverly M. Bunting, Eric C. Jeschke, James J. Mayberry, Administrative Patent Judges*

## NON-CONFIDENTIAL REPLY BRIEF FOR CROSS-APPELLANT'S

ROBERT M. HARKINS, JR.
RUYAKCHERIAN LLP
1936 University Avenue,
Suite 350
Berkeley, California 94704
(510) 944-0185
bobh@ruyakcherian.com

TIMOTHY E. BIANCHI
SCHWEGMAN LUNDBERG & WOESSNER, PA
1600 TCF Tower
121 South Eighth Street – TCF Tower
Minneapolis, Minnesota 55402
(612) 373-6900
*tbianchi@slwip.com*

*Counsel for Cross-Appellant and Appellee Team Worldwide Corporation*

OCTOBER 24, 2022

# TABLE OF CONTENTS


I. Introduction ....................................................................................... 1

II. Chaffee Does Not Render Obvious the Claims of the ’394 Patent as the Housing in Chaffee is Not “Built Into,” as the Connection to the Chamber Wall is Reversible ........................................................................................... 6

A. The Housing in Chaffee is Not “Built into” the “Inflatable Body” as the Connection to the “Inflatable Body” is Reversible ........................................ 7

1. Fig. 5 Does not Show Flange 82 Connected to Housing 90 ...................... 8

2. The Housing in Chaffee is Not “Built into” the “Inflatable Body” any Connection to the “Inflatable Body” is Reversible ....................................... 10

III. Wu and Goldsmith Do Not Meet the Proper Construction for “Inflatable Body” Which, Contrary to the Board’s Construction, Should Include a “Substantially Airtight” Requirement ................................................... 13

IV. The Board Applied the Wrong Legal Tests for Obviousness ........................ 16

A. The Board Erroneously Found Obviousness Even Where the Combinations Together Still Failed to Disclose All Claim Limitations ................................... 16

B. The Board Incorrectly Ignored the Problems to be Solved by the Cited Art and Instead Engaging in Post-Hoc, Hindsight Analysis ..................................... 17

V. The Board’s Findings of Motivations to Combine the Different Obviousness Combinations lacks Substantial Evidence ......................................................... 18

VI. The Board Erred in Ignoring Substantial Evidence of Nonobviousness .......... 22

A. The Board Erred in Only Finding a Presumption of Nexus Based Solely on the retailer Stipulation ........................................................................ 22

B. The Board Erred in Shifting the Burden of Persuasion to TWW to Prove Nonobviousness When the Petitioner Was Required to Prove Invalidity Including with Respect to Secondary Considerations of Nonobviousness .......... 24

C. The Board Erred in Ignoring Evidence of Overwhelming Commercial Success of Products that Practiced the Claims of the ’394 Patent ....................... 26

1. The Board Ignored Significant Sales Data for Products that Practice the Claims of the ’394 Patent ........................................................................ 26

2. Federal Circuit Law Does Not Require Demonstrating Market Share for Commercial Success ................................................................................ 28

3. The Board Improperly Afforded Too Much Weight to the Alleged Impact on Customer Demand of Non-Patented Features for the Infringing Products .30

VII. Conclusion ....................................................................................................31

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this brief is subject to a protective order. The confidential information on pages i, 1, 5, 22-23, 26-27, and 29-30 relates to manufactures and retailers of airbed products, including sales revenue figures and settlement information, which have been designated as confidential.

# TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)....16

*Chemours Co. FC, LLC v. Daikin Indus*., 4 F.4th 1370 (Fed. Cir. 2021)........ 28, 29

*Collabo Innovations, Inc. v. Sony Corp.*, 778 F. App'x 954 (Fed. Cir. 2019).........14

*Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.)*, 676 F.3d 1063 (Fed. Cir. 2012).. 25, 31

*Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019)........................22

*Gambro Lundia AB v. Baxter Healthcare Corp*., 110 F.3d 1573 (Fed. Cir. 1997).29

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ....................................................21

*Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379 (Fed. Cir. 2008)..14

*In re Bigio*, 381 F.3d 1320 (Fed. Cir. 2004)..........................................................20

*Intel Corp. v. VIA Techs.*, 319 F.3d 1357 (Fed. Cir. 2003) ....................................15

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563 (Fed. Cir. 1997) ..29

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877 (Fed. Cir. 1998)....17

*Panduit Corp. v. Dennison Mfg. Co*., 810 F.2d 1561 (Fed. Cir. 1987)..................26

*Smith & Nephew, Inc*. 721 F. 3d. 1371 (Fed. Cir. 2013)........................................12

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011) .......26

*Stratoflex, Inc. v. Aeroquip Corp*., 713 F.2d 1530 (Fed. Cir. 1983) ......................24

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353 (Fed. Cir. 1999) ..............17

**Statutes**

35 U.S.C. § 316(e) ..........................................................................................31

37 C.F.R. 1.83(h)(3)..........................................................................................12

## I. Introduction

None of the IPR petitions asserted any anticipating references in this case, because the ’394 Patent claims are novel—prior to this patent, no one had ever conceived of an inflatable product with a built-in pump that used a moveable conduit to allow for both powered inflation and deflation. The resulting product launched by TWW started an entirely new market for “built-in pump” airbeds with powered deflation amounting to sales revenue or more in sales.

Intex filed five IPR petitions. As covered by prior briefs, the Board reached the correct result as to its findings of non-obviousness, but erred in Case Nos. 20-1149, 20-1150, and 20-1151, incorrectly finding the challenged claims obviousness in light of prior art combinations that rely on Wu, Walker, Goldsmith, and Chaffee:

| **Appeal No.** | **IPR** | **Obviousness Grounds** | **Decision** |
|---|---|---|---|
| 20-1149 | 2018-00870 | Wu + Chaffee | Unpatentable as obvious - claims 1-12 and 16-23 |
| | | Wu + Goldsmith | Unpatentable as obvious - claims 1-12 and 16-23 |
| 20-1150 | 2018-00871 | Walker + Chaffee | Unpatentable as obvious- claims 1–3, 7–12, 16–18, 22, and 23 |
| | | Walker + Goldsmith | Unpatentable as obvious - claims 1–3, 7–12, 16–18, 22, and 23 |
| 20-1151 | 2018-00874 | Chaffee + Wu | Unpatentable as obvious - claims 1-12 and 16-23 |
| | | Chaffee + Scott + Pisante | Unpatentable as obvious - claims 1-12 and 16-23 |

None of these other prior art references was even attempting to solve the problems solved by the ‘394 Patent claims—they all involved completely different designs and goals that would not have led a person of skill in the art to the inventions of the ‘394 patent. This conclusion is further confirmed by the incredible commercial success TWW’s patent design had once introduced into the marketplace.

Regarding Wu, Intex ignores that the Board erred in its construction of “inflatable body” by not including a “substantially airtight” requirement as did two separate district courts in cases on the same term in patents on the same subject matter and by the same inventor. The ‘394 Patent itself and the prosecution history make clear that the entire purpose of the patent was to inflate a substantially airtight product and not allow for continuous airflow, whereas Wu (and Goldsmith) are specifically designed for continuous airflow and therefore fail to address the key problems solved by the ‘394 Patent. The problem being solved by Wu was to control the airflow being emitted by the holes in a manner best for medical patients, with a complicated multi-line system that has no considerations of space or storage,

FIELD OF THE INVENTION

This invention relates to a control system for controlling the flow of air to and from the chambers of a low air loss, patient supporting air mattress.



but rather only motivation to allow for easy access to an external pump. Thus, the Board applied the wrong legal test for motivation to combine by applying a hindsight analysis regarding why a user of a portable, airtight airbed for storage would want a built-in pump instead of assessing whether such a motivation would exist for a POSA to modify an air loss medical bed.

The Walker reference similarly has no relationship to the ‘394 Patent. Walker relates to a permanent piece of furniture such as a traditional sofa bed where the bed aspect can be inflated. Unlike the ‘394 Patent, there is no consideration of storage and space that would make integration of the pump into the mattress desirable—the airbed is already held within a storage frame that would not change irrespective of the pump location, and the design has sufficient room for pump to sit under the sofa. Appx010246 at ¶96. In fact, a POSA would have been motivated to ***avoid*** incorporating a pump into the mattress—because the mattress is in a folding frame, incorporating the pump into the mattress could damage the pump, the mattress, the frame, or potentially the user. Appx010230 at ¶63. The pump in Walker is large and expensive, which further would have motivated a POSA to leave it as a separate, easily replaced or repaired item. Appx010248 at ¶100. Further, the Board failed to identify how a POSA could



FIG.18

possibly incorporate that large of a pump into the air mattress, or why one would ever try to do that. There is no concern in Walker with the profile of the mattress, as the pump can sit under the frame, so a POSA would not combine it with Chaffee. The Walker airbed does not blow air through holes, so a POSA would not combine it with Goldsmith. In short, a POSA would not build a pump into Walker, and the Board erred by applying a hindsight analysis while disregarding the practicalities of the proposed combinations.

As to the final reference, not only did Chaffee fail to disclose a "housing built into the inflatable body;" Chaffee taught only that no matter what configuration is used, the housing connection should be reversible, that is, ***not*** built into. Appx006949 and Appx015160 at 5:33-48. Contrary to solving a problem with external pumps, Chaffee touts the conventional wisdom of having an external pump to allow for repair or replacement of only one part instead of the entire inflatable product, which is the opposite of the '394 Patent claims. *Id*. Because neither Chaffee nor Wu meets the "built into" limitation, the combination cannot be used for obviousness. Plus, Wu does not suggest to a POSA that Chaffee's reversible pump design should be modified, because, unlike Chaffee, Wu relates to controlling several different inputs to a multichambered bed.

The proposed three-way combination of Chaffee with Scott and Pisante is very far afield, where neither Scott nor Pisante involve the problem of an air mattress

that needs to be used, collapsed and stored. Scott relates to a car seat assembly that contains a permanent bladder for lumbar support that is never removed for storage. Appx007121-007122 at Abstract; 2:60–62. Pisante relates to a handheld vacuum/blower unrelated to inflatable products. Appx007820-007857. ***None*** of these references discloses a built-in pump, so the combination of all three cannot




render obvious any claim of the '394 Patent. Moreover, the Board's finding here is legal error because it engages in a hindsight analysis requiring a high level of creativity to combine three references




in a manner not known in the industry until Mr. Wang invented the design with the '394 Patent.

Additionally, although the Board ***agreed*** that there is a nexus between the '394 Patent claims and the enormous commercial success—almost sales revenue in sales—of products embodying the claimed inventions (which Intex ignores), the Board incorrectly found the nexus weak and incorrectly failed to find that secondary considerations show the claims to be not obvious. Finally, the Board improperly concluded that motivations to combine exist for the different obviousness combinations which were mere hindsight analysis.

TWW respectfully requests the Court reverse the Board's findings of obviousness based on Chaffe's failure to disclose a non-reversible connection, the

construction of "inflatable body," motivations to combine, and also as to secondary considerations.

## II. Chaffee Does Not Render Obvious the Claims of the '394 Patent as the Housing in Chaffee is Not "Built Into," as the Connection to the Chamber Wall is Reversible

The Board's finding that Chaffee discloses a "housing built-in pump embodiment in Chaffee that does not exist. The Board stated: "we understand Chaffee to disclose at least two different embodiments: (1) an embodiment in which flange 82 and housing 90 (as well as wall 83) are different portions of the *same* structural component and (2) an embodiment in which flange 82 and housing 90 are separate, but connected, components." Appx000038. The Board went on to conclude that embodiment "1" (above) was "built into." A finding that Chaffee does not disclose the "built into" limitation would reverse the decision on obviousness in Case No. 20-1151 and reverse grounds in the other two cases.

The Board's findings that Chaffee disclosed the "built into" limitation was erroneous for at least two reasons. First, as discussed in TWW's Opening Brief and further below, there is ***no configuration*** where flange 82 and housing 90 are shown as the same structural component. Second, even if flange 82 and housing 90 formed one component, there is no disclosure in Chaffee that represents that such a component would be built into—on the contrary, Chaffee expressly states that if the pump is one unit, the entire unit is reversibly connected, ***not*** built into. As the Board

erred by ignoring this express statement, any combinations the Board relied on regarding Chaffee are erroneous and must be reversed.

### A. The Housing in Chaffee is Not "Built into" the "Inflatable Body" as the Connection to the "Inflatable Body" is Reversible

In erroneously finding that Chaffee discloses the "built into" limitation, the Board pointed to flange 82 (shown with wall 83 in green) and housing 90 (shown in orange) in Fig. 5:




Fig. 5

The Board then pointed to a sentence in the specification regarding Fig. 5, stating, "[f]lange 82 may, for example, ***extend from housing 90*** or may be a separate component connected to housing 90" – to conclude that flange 82, housing 90, and

wall 83 are one piece. Appx995 at 5:7-9. But this conclusion is contrary to the disclosure in Chaffee.

### 1. Fig. 5 Does not Show Flange 82 Connected to Housing 90

Fig. 5 indisputably does not show flange 82 extending from housing 90. Fig. 5 shows flange 82 is connected to wall 83, not housing 90. The below portions of Figures 3 & 5 show the three components of the housing 90 (orange), flange 82 (green) and wall 83 (yellow):







Fig. 5

**There is no point of contact in Fig. 5 between flange 82 (green) and housing 90 (orange).** So, Fig. 5 cannot provide support for the statement in Chaffee's specification describing flange 82 as "extend[ing] from" housing 90. To the extent the Board relied on a combination requiring wall 83 between housing 90 and flange 82, that contradicts the only statement the Board relied on for its finding, which itself would constitute reversible error. Moreover, the record contains undisputed expert testimony that it would not

be possible to mold housing 90 with wall 83 and flange 82 in one piece in the form shown in Fig. 5. Appx-11082-011083 at ¶139.

Thus, Fig. 5 itself lends no support for the Board's finding, and the Board's conclusion must rely on text alone ("[f]lange 82 may, for example, ***extend from housing 90*** or may be a separate component connected to housing 90") for an otherwise undisclosed embodiment. In this embodiment, there is no mention of wall 83; instead, somehow flange 82 must "extend from" housing 90. But there is no further disclosure of housing 90 being "built into" the "inflatable body." Wall 83 is shown as built into the bladder, but the mere combination of flange 82 and housing 90 does not mean housing 90 is built into the bladder—Fig. 5 still shows housing 90 connected to wall 83. To the extent the Board's finding could be read to conclude that Fig. 5 could show housing 90 plus wall 83 plus flange 82 to be one piece, there is no support for that proposition, and the text does not disclose that—instead the only text cited by the Board clearly states flange 82 would extend from housing 90, not that wall 83 would extend from housing 90.

Thus, the Board's entire basis for finding the pump built into the wall in Chaffee is clearly erroneous. In its Opposition, Intex errs in concluding that TWW bases its argument on Chaffee's preferred embodiment disclosing a reversible connection so the "housing" cannot be "built into." *See* Yellow Br. at 33-34. But TWW's argument is that Chaffee ***does not disclose any non-reversible connections***

such that any "housing" cannot meet the construction of "built into." Moreover, the Board did not identify any figure, including Figure 5, in Chaffee that disclosed a non-reversible connection – because there are none.

### 2. The Housing in Chaffee is Not "Built into" the "Inflatable Body" any Connection to the "Inflatable Body" is Reversible

The Board made yet another error in incorrectly finding that Chaffee discloses a built-in pump embodiment. It ignored Chaffee's express teaching that no matter what housing 90 looks like, it should be reversibly connected and ***not*** built into the mattress. This error exists in at least two different ways.

First, the Board incorrectly assumed that if housing 90 and flange 82 were one piece, that piece would be built in. But Fig. 5 shows that is not a supported conclusion, since housing 90 plus flange 82 would still connect to wall 83 and not the bladder. There is no text or figure anywhere in Chaffee showing housing 90 integrated into the bladder.

Second, even if housing 90 were somehow (not shown) connected to the bladder, Chaffee clearly states that such a connection would be reversible, ***not*** built in. Chaffee only discloses two options for connecting fluid controller 80 to bladder 20: a first option in which portions of fluid controller 80 can disconnect from bladder 20 and a second option in which the entire fluid controller 80 (including flange 82 and housing 90) can disconnect from bladder 20. Appx000040.

> **It is also possible to construct the inflatable device such that bladder 20 and fluid controller 80 are *reversibly connected*, rather than two portions of fluid controller 80 being reversibly connected.** ***In either case, the reversible connection*** allows the removal of portions of fluid controller 80 for repair or replacement….

Appx015160, Chaffee, 5:33-48 (emphasis added).

Intex ignores that no options for a non-reversible connection between fluid controller 80 and bladder 20 are disclosed in Chaffee and the Board fails to explain its conclusion that such a non-reversible connection exists.

Chaffee explains that the reason why pump housing 90 and flange 82 are separate pieces and utilize a reversible connection is to allow "the removal of portions of fluid controller 80 for repair or replacement, preventing the entire inflatable device from having to be disposed of in the event of a failure of one component." Appx015160at 5:44-48. Also, as discussed by Dr. Stevick, Chaffee states that a goal of the patent is to ensure that the pump is accessible and removable, with the idea that it can be fixed or replaced without destroying the airbed. *Id*. Thus, there could not be any permanent connection between the pump housing 90 and flange 82.

The intrinsic evidence of Chaffee demonstrates that FIG. 5 does not disclose a one-piece housing as FIG. 5 uses hatching to show the pump housing 90 is a different element than the fluid impermeable wall 83 or flange 82. Appx001034. FIG. 5 is consistent with patent drafting rules which employ different angles of

hatching for ***different elements***. *See* 37 C.F.R. 1.83(h)(3)(" … The hatching of juxtaposed ***different elements*** must be angled in a different way.") (emphasis added.) *Id.*

In its Opposition, Intex relies on *Smith & Nephew, Inc*. to argue that TWW is 'narrowly' interpreting Chaffee based on the figures. Yellow Br. at 34; *Smith & Nephew, Inc*. 721 F. 3d. 1371, 1378 (Fed. Cir. 2013). But *Smith & Nephew* discussed limiting the sizes of components in a prior art reference based only on a figure. Intex ignores that for the component at issue in *Smith & Nephew*, this Court stated it was well known in the art that different sizes could be used. *Id*. Here, the Board made no such conclusion that non-reversible connections were well known in the art. Moreover, Intex ignores that the disclosure of Chaffee focused on reversible connections between the housing and the inflatable body, consistent with the figures and contrary to the Board's erroneous conclusion.

The Board's argument that Chaffee discloses a one-piece housing appears to rely in part on Petitioners' statement that Chaffee discloses this one-piece structure as connected to bladder 20 by "adhesive or heat seal." Appx000035. But Chaffee actually states "[f]or example, bladder 20 may be adhered or sealed **to a portion of** fluid controller 80**,** such as with an adhesive or heat seal." Appx006948-006949at 4:67-5:2, emphasis added. Thus, this language provides only an example of a

connection between bladder 20 and **a portion of** fluid controller 80. In any such embodiment the remainder of fluid controller 80 would still be removable.

## III. Wu and Goldsmith Do Not Meet the Proper Construction for "Inflatable Body" Which, Contrary to the Board's Construction, Should Include a "Substantially Airtight" Requirement

The Board's failure to include a "substantially airtight" requirement in the construction of the term "inflatable body" led to the Board's determination that the Wu and Goldsmith references meet the "housing built into the inflatable body" limitation in all challenged claims of the '394 Patent. If the construction of "inflatable body" properly included the "substantially airtight" limitation, there is no dispute that Wu and Goldsmith fail to meet the "built into the inflatable body" limitation as neither Wu nor Goldsmith are designed to retain air. As discussed *supra*, Wu is a continuous flow medical airbed Goldsmith did not even involve inflatables and was a conventional inner spring mattress to blow hot or cold air around the sleeper with no connection to inflating and deflating an airbed with a single integrated pump. Appx006947, 1:1-19. A finding that the construction of "inflatable body" includes "substantially airtight" would reverse the decision on obviousness in Case No. 20-1149 and reverse grounds in the other two cases.

As TWW explained in its Opening Brief, the specification and prosecution history of the '394 Patent do not support the Board's refusal to include a "substantially airtight" limitation. The Board and Intex acknowledge that the U.S.

District Court for the Eastern District of Texas construed "inflatable body" for the '394 Patent to include the "substantially airtight" requirement. Appx007694-007699. But the Board and Intex disagree with that Court's construction because the Court relied on evidence concerning the exact same term from other patents on the same subject matter and by the same inventor. *Id.* As explained in the Opening Brief and below, the Board erred in not properly considering this evidence.

In its Opposition, Intex incorrectly argues that TWW has invoked the doctrine of prosecution history estoppel or prosecution disclaimer in relying on evidence from district court claim construction on the same term for very similar patents by the same inventor. Yellow Br. at 40-42. Intex cites several cases for this position, all of which are inapplicable as TWW has never argued that this evidence represents prosecution history estoppel or prosecution disclaimer. Such arguments would involve the intrinsic record. Instead, TWW points to the extensive record on the term "inflatable body" for the '018 Patent and related patents as extrinsic evidence which the Board can and should consider in its construction. This Court has repeatedly held that "**[a] court** may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *see also Collabo Innovations, Inc. v. Sony Corp.*, 778 F. App'x 954, 958 (Fed. Cir. 2019) ("**[T]he Board** 'may look to extrinsic evidence so long as the extrinsic

evidence does not contradict the meaning otherwise apparent from the intrinsic record.'").

The Board erred by not properly considering this important extrinsic evidence for the construction of the term "inflatable body" to include the "substantially airtight" requirement. Extrinsic evidence is used in claim construction "to resolve an ambiguity in a disputed claim term" if it does not contradict the meaning of that term. *See Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003). Because the addition of "substantially airtight" to the construction of "inflatable body" does not contradict the meaning of this term (as discussed in Red Br. at 63-66), the extrinsic evidence from district courts does not contradict the inclusion of "substantially airtight" in this construction. *See id*. Contrary to Intex's arguments, the extrinsic evidence from the actions of district courts in two separate cases (as discussed in Red Br. at 65-66) is highly relevant to construing the term for the '394 Patent.

Because the Board's determination of obviousness for each ground involving Wu and Goldsmith in Case No. 20-1149 and individual grounds in the other two cases depends on the Board's failure to include the requirement of "substantially airtight" in the construction of inflatable body," the inclusion of this requirements in the construction of "inflatable body" would reverse those obviousness determinations.

## IV. The Board Applied the Wrong Legal Tests for Obviousness

### A. The Board Erroneously Found Obviousness Even Where the Combinations Together Still Failed to Disclose All Claim Limitations

As discussed in TWW's Opening Brief, the Board found obviousness combinations even where the combination together was missing claim limitations. For example, applying the correct claim construction of "inflatable product," Wu is not an inflatable product, because it is specifically design for blowing air out of holes in the mattress. Thus, the combination of Wu and Goldsmith, for example, together still fail to disclose all claim limitations. As a matter of law, a patent claim cannot be held invalid as obvious based on combination that still fails to disclose all limitations of the challenged claim. *See ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) ("To invalidate a patent claim based on obviousness, a challenger must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, …."). . Nothing in Intex's opposition challenges that proposition of law.

Correcting for the Board's error in finding Chaffee to include a built-in pump, the combinations of Wu and Chaffee, Walker and Chaffee, Chaffee and Wu, and Chaffee together with Scott and Pisante all fail because those combinations do not disclose any built-in pump housing.

Correcting the Board's errors regarding claim construction and misinterpreting Chaffee leaves only the combination of Walker plus Goldsmith. But neither Walker nor Goldsmith discloses how one would incorporate Walker's pump into the wall of the air mattress, so that combination is unsupported. Moreover, as discussed, a POSA would be motivated by Walker to leave the pump separate, and Goldsmith does not address incorporating a pump into the mattress so it cannot supply any motivation to do that.

### B. The Board Incorrectly Ignored the Problems to be Solved by the Cited Art and Instead Engaging in Post-Hoc, Hindsight Analysis

As a matter of law, a patent claim cannot be held invalid based on hindsight analysis. *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness."). Intex's Opposition fails to challenge this point of law. Instead, Intex argues that a POSA would have been "motivated" to make changes considering the advantages that it asserts having the benefit of Mr. Wang's invention. But the Board cannot rely on so-called "advantages" that operate against the teachings of the asserted patents. *See Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) ("There is no suggestion to combine, however, if a reference teaches away from its combination with another source.") Thus, Intex cannot justify the Board's failure to note that Wu is a complex air flow system with no space

considerations and is a more expensive system with motivation to maintain a separate pump that can be replaced, or that Walker is a sofabed that also has no space considerations and is a more expensive system with motivation to maintain a separate pump that can be replaced. Nor was the Board permitted as a matter of law to ignore that Chaffee expressly teaches the advantage of a reversible connection (i.e., having the pump not built in) and discloses that any configuration would leave the pump separate so it could easily be repaired or replaced. Appx006949 at 5:44-48. The Board's failure to consider these teachings or the problems addressed by the prior art shows that the Board applied the wrong legal test of hindsight analysis.

## V. The Board's Findings of Motivations to Combine the Different Obviousness Combinations lacks Substantial Evidence

Because the Board's determination of obviousness for each ground also depends on a determination of a POSA's motivation to combine, a finding that the motivation does not exist would reverse those obviousness determinations. In addition, even if the Court found a motivation to combine, the combinations listed below do not disclose the limitations of the claims of the '394 Patent.

For the Wu and Chaffee combination in 20-1149 (and the Chaffee and Wu combination in 20-1151), Intex argues that the testimony of TWW's expert contradicts TWW's position that a POSA would avoid building Wu's motor and pump into the side of a bed given at least the issue of heat generated by the motor and pump. Red Br. at 76-77. Intex cites to Dr. Stevick's deposition testimony as

stating overheating would not be an issue. Yellow Br. at 56-57. But Dr. Stevick only responded to a hypothetical question about implementing heat management issues based on a UL standard and that a POSA would know how to do this. Appx8141 at 459:9 – 460:10. He did not testify that a POSA would be motivated to combine Wu and Chaffee in the face of overheating issues.

Also, with respect to the incompatibility of Wu's flowing air system and Chaffee to a POSA, the Board incorrectly assumed that TWW based this position on a construction of "inflatable body" that was "substantially airtight." But the Board ignored that its own decision pointed out that the claims of the '394 Patent are directed to an "inflatable <u>product</u>" and that this would be "substantially airtight." "Inflatable body" is just one limitation of the claims. Appx000018-000019. Specifically, the claims of the '394 Patent are directed to an "inflatable product" that includes an "inflatable body" and other components. Appx000546. Although the Board concluded – in error – that an "inflatable body" was not "substantially airtight" it acknowledged that the overall claims were directed to a "substantially airtight" "inflatable product." A POSA would be motivated to solve a problem presented by the entire claim – which required a "substantially airtight" "inflatable product" – and not just one limitation.

For the Wu and Goldsmith and the Walker and Goldsmith combinations, Goldsmith is not analogous art because, as the Board concluded, Goldsmith is

directed to a conventional inner spring mattress with holes in it and a blower to circulate air through the holes for heating or cooling. The Board acknowledged that Goldsmith was not in the same field of endeavor as the ’394 Patent – part of the test for finding analogous art – but still found that a conventional inner spring mattress was “reasonably pertinent” – the other part of the analogous art test - to resolving issues with an inflatable airbed. The Board’s conclusion was based only on a single short statement in Goldsmith that “no outside [blower] unit is necessary.” Appx000117-000118. Goldsmith is not “reasonably pertinent” to the problem the ‘394 Patent inventor was trying to solve as it had no relation to inflating and deflating an air mattress with a built-in pump. *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

For the Walker obviousness arguments generally, the Board ignored the motivations of a POSA regarding that reference. The Walker art is directed only to ***framed*** air mattresses that do not have space considerations. Specifically, Walker discloses a sofabed where the mattress stores by folding into the sofa, not collapsing it separately for storage. Intex also ignores the fact that because of the permanent frame in Walker, a POSA would be highly disincentivized to build a pump in, since the pump could hit the frame when folding, damaging the pump, the frame, or the air mattress.

For the Walker and Chaffee combination, Intex does not dispute that its own expert, Dr. Beaman, testified that attempting to integrate the Walker pump into an air mattress presents many design challenges that are solved by leaving the pump housing external." Appx002438, Appx020324-020331. The Board improperly rejected this testimony, which is also supported by the testimony of TWW's expert. *See* Red Br. at 79.

For the Chaffee, Scott, and Pisante combination, TWW's point regarding Intex's expert, Dr. Beaman, was that he advocated the same motivation to combine argument for Chaffee and Scott that Intex used for combining Chaffee and Wu when Scott discloses a much different device than Wu. Summarily concluding that a POSA would be motivated to combine Chaffee with Scott for the same reasons as Chaffee with Wu is just improper hindsight. *Graham v. John Deere Co*., 383 U.S. 1, 36 (1966) ("[Secondary considerations] may also serve to 'guard against slipping into use of hindsight,' and to **resist the temptation to read into the prior art the teachings of the invention in issue**.") (emphasis added) (internal citations omitted)

## VI. The Board Erred in Ignoring Substantial Evidence of Nonobviousness

### A. The Board Erred in Only Finding a Presumption of Nexus Based Solely on the [redacted] Stipulation

In its Final Written Decisions, the Board correctly held that TWW was entitled to a presumption of nexus based on the admission of infringement of the ’394 Patent in prior litigation by TWW against [redacted] (“[redacted] Litigation”). In its Opposition Intex – like the Board – ignores the extent of these admissions of infringement and the additional fact that TWW’s expert demonstrated that TWW’s products practice the challenged claims of the ’394 Patent. Because the extent of infringement was greater than that found by the Board and TWW’s products practiced the claims of the ’394 Patent, TWW was entitled to a much stronger presumption of nexus than that attributed by the Board.

In the [redacted] Litigation, Defendant [redacted] and Intervenors [redacted], [redacted], and [redacted] entered a stipulation (“[redacted] Stipulation”) that the inflatable airbeds from numerous manufacturers, including [redacted] and [redacted], infringed at least the majority of the challenged claims of the ’394 Patent (collectively “Infringing Products”). Appx014798-014804. Based on this [redacted] Stipulation, the Board properly concluded that the Infringing Products “embod[y] the claimed features, and is coextensive with them.” *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). (“A patentee is entitled to a presumption of nexus when the patentee shows that the asserted objective evidence is tied to a

specific product and that product embodies the claimed features, and is coextensive with them.").

However, the Board erred in limiting the presumption of nexus to only the products which were admitted in the retailer Stipulation as infringing the asserted claims of the '394 Patent. Appx14247. retailer, manufacturer, manufacturer and manufacturer also entered the retailer business term, in which they expressly agreed that all accused products, including the accused manufacturer products, were subject to future business term for infringement of the'394 Patent. Appx14250. The Intervenors agreed to arbitrate the business term for payments for future sales of products subject to the agreement.[1] *Id*. Under the retailer business term and subsequent business term, TWW was entitled to payments for future sales of all accused products. *Id*. Consequently, consistent with the retailer Stipulation and retailer business term, TWW should be entitled to the presumption of nexus as to all Accused Products.

In addition, although the Infringing Products alone provide a sufficient basis for TWW's presumption of a nexus, the Board ignores evidence concerning TWW's own products practicing the claims of the '394 Patent. Appx35-40. The Board incorrectly stated that Dr. Stevick, TWW's expert, failed to provide sufficient

---

[1] These future sales also included sales of products which manufacturer and manufacturer initially offered as alleged design-arounds for the '394 Patent. These alternative designs were found to be infringing in arbitration and subject to future business term. Appx020382.

support by comparing different claim limitations against different TWW pumps/products. *Id*. But the Board ignores that Dr. Stevick provided analysis of the different claim limitations of the '394 Patent against *exemplary* TWW pumps/products. For each limitation Dr. Stevick provides an exemplary analysis and then states, *e.g.*, claim 1 includes "the element of 'the fan and motor inflating the inflatable body when the air conduit is in the first position. Each of the TWW Pump models satisfy this element." Dr. Stevick demonstrated that the TWW products meet the claim limitations of the '018 Patent. Appx010280-010292 at ¶¶159-195. Moreover, Intex never argues that the TWW products did not practice the Challenged Claims of the '394 Patent.

### B. The Board Erred in Shifting the Burden of Persuasion to TWW to Prove Nonobviousness When the Petitioner Was Required to Prove Invalidity Including with Respect to Secondary Considerations of Nonobviousness

Further, the Board erred in assessing secondary considerations as if TWW had the burden of proving nonobviousness. In fact, the burden of persuasion of invalidity, including with respect to secondary considerations of nonobviousness, always remains with Petitioners. The Board erred as it determined the challenged claims of the '394 Patent were obvious and then shifted the burden of persuasion to TWW to prove nonobviousness. But an evaluation of nonobviousness is part of the overall obviousness analysis. *See Stratoflex, Inc. v. Aeroquip Corp*., 713 F.2d 1530, 1538-39 (Fed. Cir. 1983) (citations omitted) ("Thus evidence rising out of the so-

called 'secondary considerations' must always when present be considered en route to a determination of obviousness. . . . ").

Here, TWW presented substantial evidence of nonobviousness, and the Petitioners had the burden of persuasion to rebut this evidence of nonobviousness – which they did not. For example, whereas Dr. Stevick undertook a wide review of the industry to find that the term "built-in pump" that inflates and deflates had become synonymous with the '394 Patent invention, Petitioners did no rebuttal review of the industry to counter Dr. Stevick's review. Thus, Petitioners could not show that any significant sales were attributed to anything other than the '394 Patent invention. The Board improperly shifted the burden to TWW to disprove obviousness in contradiction of statute and this Court's decisions:

> The district court erred, however, by making its finding that the patents in suit were obvious before it considered the objective considerations and **by shifting the burden of persuasion to Cephalon [Patent Owner]**. In doing so, the district court contravened this court's precedent requiring that a fact finder consider all evidence relating to obviousness before finding a patent invalid on those grounds, and **the court imposed a burden-shifting frame-work in a context in which none exists**.

*Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.),* 676 F.3d 1063, 1075 (Fed. Cir. 2012) (emphasis added).

### C. The Board Erred in Ignoring Evidence of Overwhelming Commercial Success of Products that Practiced the Claims of the ’394 Patent

In its Final Written Decision, the Board erred in only attributing some weight to the overwhelming commercial success of products practicing the Challenged Claims of TWW’s ’394 Patent. Appx000089.

#### 1. The Board Ignored Significant Sales Data for Products that Practice the Claims of the ’394 Patent

Contrary to the Board’s determinations, the record includes specific evidence of overwhelming sales of products that practice the claims of the ’394 Patent, including all accused products from the retailer Litigation and TWW’s own products. As discussed in TWW’s Opening Brief, products admitted to infringe the ’394 Patent in the retailer Litigation had almost sales revenue in sales. Red. Br. at 72-74. Such significant sales of ’394 Patent practicing products demonstrates substantial commercial success. *See Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376 (Fed. Cir. Aug. 26, 2011) (“[A]s evidence by Brown & Williamson’s licenses, which cost millions of dollars, Williams’ invention had achieved considerable market acceptance and commercial success.*”); Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1571-1572 (Fed. Cir. 1987) (Finding **“[t]he strong evidence of nonobviousness**, … .. As the district court said, ‘**This is a case which presents that issue [effect of nonobviousness evidence] as clearly as any**

**I've seen'" including based upon Panduit's annual sales of $50 million**.) (emphasis added).

In its Opposition, Intex ignores the evidence of significant sales of products practicing the '394 Patent. TWW's expert, Dr. Becker, provided expert testimony on these significant sales. Specifically, for the accused products, Dr. Becker stated: "During the period from April 2, 2011 through August 31, 2018, retailer sold approximately units sold units of air bed models that practiced the invention of the '394 Patent, ***which generated sales in excess of*** sales revenue." Appx019180 at ¶42 (emphasis added)

Dr. Becker also provided expert testimony on sales of TWW's own products that practice the claims of the '394 Patent. Dr. Becker noted that since 2010 TWW sold over units sold airbeds that practiced the inventions of the '394 Patent and that these ***sales generated over*** sales revenue ***of sales for TWW***. Appx019178, ¶38 (emphasis added).

Further, both Intex and the Board ignore Dr. Stevick's expert testimony on his review of the entire airbed industry. Appx010292-010294, ¶196. Dr. Stevick has studied the airbed industry for several years: "my analysis of the airbed market indicates that ***the term electric "built-in pump" for inflation and deflation of airbeds refers to the '394 patented design***. Over at least the past ten years, ***the term for inflate/deflate airbeds has been used exclusively to mean the '394 patented***

***design***." Appx010312-010313, ¶218 (emphasis added). Intex does not argue, and Petitioners did no such review of the industry to determine whether built-in pump airbeds ("BIP") with an inflate and deflate capability in the industry were coextensive with the '394 Patent. Petitioners failed to meet their burden to prove TWW's objective evidence of nonobviousness for commercial success was not entitled to substantial weight.

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *Chemours Co. FC, LLC v. Daikin Indus.*, 4 F.4th 1370, 1378 (Fed. Cir. 2021).

**2. Federal Circuit Law Does Not Require Demonstrating Market Share for Commercial Success**

As discussed *supra*, TWW has presented evidence of overwhelming sales of products which practice the claims of the '394 Patent. In arguing that TWW did not show market share, Intex ignores that the Federal Circuit has recognized that – in the face of significant sales of products with a nexus to the claimed invention (as here) – evidence of market share is not required. In *Chemours Co.*, this Court addressed market share and commercial success:

> **[M]arket share data, though potentially useful, is not required to show commercial success**. *See Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360-61 (Fed. Cir. 1999) ("Although sales figures

> coupled with market data provide stronger evidence of commercial success, sales figures alone are also evidence of commercial success.”); …
>
> **The Board, however, erred in its analysis that gross sales figures, absent market share data, “are inadequate to establish commercial success**.”

*Chemours Co. FC, LLC v. Daikin Indus*., 4 F.4th 1370, 1378 (Fed. Cir. 2021) (emphasis added). Indeed, this Court has found significant evidence of commercial success based on much smaller sales data (with no market share data) than the almost sales revenue in sales of products practicing the claims of the ’394 Patent. *See Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (“The record contains significant evidence of the commercial success of [the] invention. The record shows that [a competitor] sold over 14,800 dialysis machines allegedly incorporating the [claimed] invention since 1987.”); *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1566, 1572 (Fed. Cir. 1997) (affirming a finding that “sales evidence . . . shows [strong commercial] success,” where the “sales evidence” consisted solely of the patentee's “$ 17 million of sales from 1979 through 1984, and its $ 4 million of annual sales from 1985 through 1989.”).

Thus, absent evidence to the contrary, it was improper for the Board to reduce the weight of TWW’s objective evidence of commercial success based on a lack of market share data considering almost sales revenue in sales of products practicing the claims of the ’394 Patent.

### 3. The Board Improperly Afforded Too Much Weight to the Alleged Impact on Customer Demand of Non-Patented Features for the Infringing Products

The Board also improperly reduced the weight it assigned to TWW's objective evidence of commercial success based on other alleged airbed "features," such as comfort and durability, which the Board believed contributes more to customer demand than a built-in pump. Appx000085-000086. The Board and Intex completely ignore that because "comfort and durability" are common for both NBIP (non-BIP) and BIP airbeds with inflate and deflate capability, these characteristics cannot be the basis for consumer demand for just BIP airbeds with inflate and deflate capability. So, if all consumers wanted was "comfort and durability" they could purchase less expensive NBIP airbeds. But TWW's objective evidence shows retailer received more revenue from BIP airbeds with inflate and deflate capability than NBIP airbeds. In fact, in an email from an manufacturer employee to a retailer buyer, retailer had experienced great reductions in airbed sales when inflate/deflate BIP airbeds were not sold side-by-side external pump airbeds. Appx010313-010314 at ¶219. As with the other factors for secondary considerations of nonobviousness, the Board did not articulate whether Petitioners met their burden, by a preponderance of the evidence, to show the built-in pump does not drive sales for BIP airbeds – which Petitioners did not.

Furthermore, Intex did not argue, and Petitioners did not present any evidence to dispute that "conform" and "durability" are common to BIP airbeds with an inflate and deflate capability and NBIP airbeds. The Board improperly shifted the burden to TWW to disprove obviousness in contradiction of statute and this Court's decisions. *See* 35 U.S.C. 316(e); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d at 1075.

## VII. Conclusion

In view of the legal and/or factual errors and/or lack of sufficient supporting evidence, this Court should reverse the Board's decision. The Court should rule that the United States Patent and Trademark Office has erred in finding challenged claims 1-12 and 16-23 of the '394 Patent invalid as obvious.

/s/ Robert M. Harkins, Jr.
Robert M. Harkins, Jr.
CHERIAN LLP
1936 University Ave, Ste 350
Berkeley, CA 94704
(510) 944-0190
bobh@cherianllp.com

Timothy Bianchi
SCHWEGMAN, LUNDBERG & WOESSNER P.A.
121 South 8th St – 1600 TCF Tower
Minneapolis, MN 55402
(612) 373-6912
tbianchi@slwip.com

*Counsel for Appellant Team Worldwide Corp.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151

**Short Case Caption:** Intex Recreation Corp. v. Team Worldwide Corporation

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6982 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 10/24/2022

Signature: /s/ Robert M. Harkins, Jr.

Name: Robert M. Harkins, Jr.

Save for Filing

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2020-1141, 2020-1142, 2020-1143, 2020-1149, 2020-1150, 2020-1151

**Short Case Caption:** Intex Recreation Corp. v. Team Worldwide Corporation

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 12 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/24/2022

Signature: /s/ Robert M. Harkins, Jr.

Name: Robert M. Harkins, Jr.